**UNITED STATES v. GENERAL ELECTRIC CO. et al.**

**Civ. A. No. 1364.**

United States District Court
D. New Jersey.

Oct. 2, 1953.

See also, 95 F.Supp. 165.

Leonard J. Emmerglick, Sp. Asst. Atty. Gen., John S. James, Sp. Atty., New York City, for plaintiff. Marcus H. Hollabaugh, Sp. Asst. to the Atty. Gen., Stanley N. Barnes, Asst. Atty. Gen., of counsel.

Katzenbach, Gildea & Rudner, by George Gildea, Trenton, N. J., for General Electric Co. and International General Electric Co., Inc. Whitney North Seymour, Alexander C. Neave, Albert C. Bickford, New York City, Quincy D. Baldwin, Cleveland, Ohio, Gerard Swope, Jr., George G. Gallantz, Armand F. Macmanus, New York City, John A. Evans, Pleasantville, N. Y., of counsel.

Pitney, Hardin & Ward, Newark, N. J., by Arthur J. Martin, Jr., Newark, N. J., for Sylvania Electric Products, Inc. Ropes, Gray, Best, Coolidge & Rugg, by Warren F. Farr, John B. Hopkins, Charles Rugg, Boston, Mass., Arthur L. B. Richardson, Manhasset, N. Y., of counsel.

Edgar W. Hunt, Lambertville, N. J., for N. V. Philips' Gloeilampenfabrieken. Sullivan & Cromwell, by George C. Sharp, Emory H. Sykes, Howard T. Milman, New York City, of counsel.

Stryker, Tams & Horner, by Josiah Stryker, Newark, N. J., for Westinghouse Electric & Manufacturing Co. Cravath, Swaine & Moore, by Donald C. Swatland, New York City, of counsel.

Richard Eyre, New York City, for Tung-Sol Electric, Inc.

David Erickson, Lynn, Mass., for Consolidated Electric Lamp Co. Hughes, Hubbard, Blair & Reed, by Edwin Foster Blair, New York City, of counsel.

Greene & Hellring, by Israel B. Greene, Bernard Hellring, Newark, N. J., for petitioner Bond Lamp Works.

Kessler & Kessler, Newark, N. J., by Arthur J. Brothers, New York City, for Jewel Lamp Co. and others.

Joseph L. Rauh, Jr. for Max Ettinger and Herbert J. Howard, intervenors on application of Government for interim relief.

## TABLE OF CONTENTS

NOTE:

Headings listed in Roman numerals in column entitled "Section" refer to provisions which will constitute the Final Judgment.

Headings not listed in the said column refer to discussions of subjects proposed by the parties, but which will not be included in the Final Judgment.

| | Section | Page |
|---|---|---|
| Recital of Final Judgment.................To precede | I | |
| Jurisdiction ........................................ | I | |
| Definitions ........................................ | II | |
| Applicability of Judgment........................... | III | |
| Adjudications ..................................... | | |
| Injuncion Against Performance of Agreements........ | IV | |
| Patents and Technology | | |
| Dedication of Existing Patents on Lamps and Lamp Parts .................................... | V A | |
| Licensing of Patents on Lamp Machinery......... | V B | |
| Licensing of General Electric's Future Patents.... | V C (1) | |
| Reciprocity .............................. | C (2) | |
| License Regulations .......................... | V. D | |

Technological Information on Manufacture of
 Lamps and Lamp Parts..................... V E (1)
Blue Prints and Technological Information Re-
 lating to Lamp Machinery................. E (2)
 Injunctions Relating to Patents................... V F
Competitive Bidding and Trademarks................. VI
Government's Proposed Section X Covering Distribution...........
General Injunctions ....:....................... VII
Statutory Rights .................................. VIII
Domestic Divestiture ...............................
Foreign Investments ............................... IX
Access of Department of Justice to Records and Inter-
 views; Reports ................................... X
Activities of Philips .............................. XI
Retention of Jurisdiction........................... XII
Opinion as Findings ............................... XIII
Interim Relief ...........................

 • • •

Exhibit A .............................................
Exhibit B .............................................
Appendices ...........................................

FORMAN, Chief Judge.

Following the filing of an opinion in this case, reported in D.C.N.J.1949, 82 F. Supp. 753, the Government and General Electric [1] submitted proposed forms of judgments to implement the said opinion. Philips, Westinghouse, Sylvania and Tung-Sol also offered suggested provisions in regard to portions of the proposed judgment which would affect them, and they and other defendants were heard with regard to aspects of the judgment by which they would be affected. Hearings concerning the proposed remedies and the Government's application for interim relief were had at which testimony was offered, oral arguments made and briefs were submitted. Following will be found the provisions of the judgment which are deemed to be applicable in this case. After each provision an annotation will follow discussing the origin and reason for its inclusion in the judgment.

## FINAL JUDGMENT

Plaintiff, United States of America, having filed its complaint herein on January 27, 1941, and the defendants, and each of them, having appeared and filed their answers to such complaint, and American Blank Company and Empire Machine Company having been dissolved prior to the commencement of the action, and an order having been entered herein dismissing the complaint as to them; and Corning Glass Works and plaintiff having entered into a consent judgment on March 7, 1946; and Westinghouse Electric Corporation (sued as Westinghouse Electric and Manufacturing Company) and plaintiff having entered into a consent judgment on April 10, 1942; and said Westinghouse Electric Corporation having acquired the lamp assets of defendant Ken-Rad Tube & Lamp Company, and an order having been entered herein dismissing the complaint as to said Ken-Rad Tube & Lamp Company;

---

1. The shortened name for this defendant as well as for the others will be used in this memorandum in the form to which they were referred in the reported opinion.

and this action having come on for trial; and the Court, after the taking of evidence, and considering the briefs and arguments submitted by the parties, having filed its opinion herein on January 19, 1949, which was certified as the Findings of Fact and Conclusions of Law; and the Court after taking further evidence, and after considering further arguments and briefs submitted by the parties, having filed an opinion on October 2, 1953 as to the remedies, and having directed entry of Judgment pursuant to Rule 52 of the Rules of Civil Procedure, 28 U.S.C.;

Now Therefore, it is this —— day of ——, 1953 Ordered, Adjudged and Decreed as follows:

### Section I

### JURISDICTION

This Court has jurisdiction of the subject matter of this cause of action and each of the parties thereto, and the complaint states a cause of action against the defendants, and each of them, under Sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1, 2.

The foregoing language of the title and recital is proposed by General Electric except for a modification referring to this opinion suggested by the plaintiff. Section I, "Jurisdiction", was proposed by the Government. The title and recital as modified and Section I were acceptable to the parties.

### Section II

### DEFINITIONS

As used in this Judgment:

A. "Lamps" means any electrical device the primary purpose of which is to convert electric energy into light within the visible spectrum by means of an incandescent filament. As so defined "lamps" does not include fluorescent or electric discharge lamps, photoflash lamps or the so-called arc or enclosed arc lamps.

B. "Lamp parts" means any part, material or element made for, used in, or constituting an integral part of, an incandescent lamp (such as, but not limited to, glass bulbs, tubing and cane, bases, wire and gases).

C. "Lamp machinery" means any machinery used in the manufacture or assembly of incandescent lamps or lamp parts, including glass parts.

D. "Patent" (or "patents") means any existing United States Letters Patent and Applications, and any divisions, continuations, reissues and extensions of such patents, relating, but only in so far as they relate, to lamps, lamp parts or lamp machinery, owned or controlled by any of the defendants, or under which any of them has a right to grant licenses or sublicenses, at the date of this Judgment.

E. "Future patent" (or "patents") means any United States Letters Patent and Applications, and any divisions, continuations, reissues and extensions of such patents, relating, but only in so far as they relate, to lamps, lamp parts or lamp machinery, owned or controlled by any of the defendants, or under which any of them has a right to grant licenses or sublicenses, within a period of five years from the date of this judgment.

F. "United States" means the United States of America, its territories and possessions.

G. "Subsidiary" of a defendant corporation means a corporation more than 50% of whose stock entitled to vote upon election of directors (other than preferred stock entitled to vote upon the failure of the corporation to pay certain dividends) is owned or, directly or indirectly, controlled by such defendant corporation.

H. "Person" means an individual, partnership, firm, association or corporation. For the purpose of this definition, and, as used in this Judgment, a corporate defendant and its subsidiaries shall be considered to be one person.

I. "General Electric" means defendant General Electric Company, a New York corporation, with its principal places of business in New York, N. Y. and Schenectady, N. Y.

J. "International" means defendant International General Electric Company, Incorporated, a New York corporation with its principal place of business in New York, N. Y.

K. "Philips" means the defendant N. B. Philips' Gloeilampenfabrieken, a corporation organized under the laws of Holland, with its principal place of business at Eindhoven, Holland.

L. "Consolidated" means the defendant Consolidated Electric Lamp Company, a Massachusetts corporation, with its principal place of business at Lynn, Massachusetts.

M. "Sylvania" means the defendant Sylvania Electric Products, Inc., with its principal place of business at Salem, Massachusetts, and sued herein as Hygrade Sylvania Corporation.

N. "Chicago Miniature" means the defendant Chicago Miniature Lamp Works, an Illinois corporation, with its principal place of business at Chicago, Illinois.

O. "Tungsol" means the defendant Tung-Sol Electric, Inc., a Delaware corporation, with its principal place of business at Newark, New Jersey, and sued herein as "Tung-Sol Lamp Works, Incorporated."

P. "Defendants" means the defendants General Electric, International, Sylvania, Philips, Consolidated, Chicago Miniature and Tungsol.

Q. The term "lamp agency agreement" means an agreement whereby any defendant appoints another person its lamp agent to distribute lamps owned by said defendant.

Definitions A, B, C, F, H, I, J, L, M, N, O and P are not disputed substantially.

Definition D combines plaintiff's proposed definitions D and E with the clarifications suggested by General Electric and Philips.

Definition E incorporates plaintiff's proposed definition F over the objection of defendants General Electric, Philips and Tungsol except that the period during which the provision shall be effective is reduced from ten years to five years. This will be dealt with further under Section V entitled "Patents and Technology".

Definition G incorporates the words "more than" before "50%" and strikes out the words following it, "or more", in plaintiff's proposed definition H which was identical with General Electric's proposed definition F.

Definition K incorporates the Government's proposed definition L except for the word "formerly" which followed the words "place of business" and eliminates the second sentence thereof.

Definition Q incorporates General Electric's proposed definition Q which as originally submitted read as follows: "The term 'lamp agency agreement' means a written agreement whereby General Electric appoints another person its lamp agent to distribute lamps owned by General Electric."

Philips requested (1) that there be inserted at the point in the judgment where patents are defined a list of those defendants which will be affected by Section V relating to patents and technology, as it appears hereinafter, and (2) that as to it, "patents" should be defined as those it possessed as of December 31, 1950, (when the IGE-Philips agreement was terminated) and not the date of the judgment. These requests must be denied.

## Section III

### APPLICABILITY OF JUDGMENT

The provisions of this Judgment applicable to any defendant shall apply to such defendant, and to each of its subsidiaries, officers, directors, employees, successors, assigns and all other persons acting under, through or for such defendant and shall apply to operations and ac-

tivities in or affecting commerce as defined by the antitrust laws of the United States.

 After the words "and all other persons acting" the Government's proposed judgment included the phrase "or claiming to act". The Government's proposal concluded with the clause "and shall apply to all acts of such defendants whether acting directly, or indirectly, through its subsidiaries, or other agents." These suggestions will be omitted as they are unnecessary.

General Electric asked that its lamp agents be specifically exempted from the reach of the judgment by the provision "other than lamp agents as herein defined" after the words "through or for such other defendant". If a lamp agent is not a party to this suit, as General Electric contends, of course he would not be bound by the judgment, and there is no necessity to so specify. It is, on the other hand, conceivable that a lamp agent might serve General Electric in such a manner as to constitute a genuine agent, and in such a situation it should not be inferred that he would be exempt from this judgment.

General Electric and Philips sought to limit the applicability of the judgment to activities which are in or affect commerce as defined in section 1 of the Clayton Act, 15 U.S.C.A. § 12. As written the standard has been broadened to the "antitrust laws of the United States" generally.

## ADJUDICATIONS

Objection was made by General Electric and other defendants to inclusion in the judgment of the Government's section entitled "Adjudications", which amounts to a recital of the illegal acts of the various defendants. Inasmuch as the earlier opinion in this case constitutes findings of fact and conclusions of law, no purpose can be served by including this section in the decree. Consequently it has been deleted.

## Section IV

## INJUNCTION AGAINST PERFORMANCE OF AGREEMENTS

A. Each of the contracts, agreements or patent licenses referred to in Exhibit A hereto annexed is hereby terminated, and each of the defendants who is or was a party thereto is enjoined and restrained from observing, performing, renewing or adhering to each such contract, agreement or patent license.

B. Each of the contracts, agreements or patent licenses referred to in Exhibit B hereto annexed is hereby terminated in so far as it pertains to lamps, lamp parts, and lamp machinery, and each of the defendants who is or was a party thereto is enjoined and restrained from observing, performing, renewing or adhering to each such contract, agreement or patent license in so far as it so pertains.

C. Nothing contained in this Section IV shall be deemed (a) to terminate the rights of any defendant to use on a non-exclusive and unrestrictive basis, any patent or foreign patent under which any such defendant has heretofore been licensed, or (b) to terminate the power, if any, of any such defendant to issue sublicenses or immunities under any such patent or foreign patent.

The Government's proposed judgment groups together both domestic and foreign agreements found to have violated the antitrust laws of the United States and read as follows: "The contracts, agreements and patent licenses listed in Exhibit A to this Judgment are hereby declared and adjudged to be illegal and in violation of Sections 1 and 2 of the Sherman Act, and are hereby declared to be cancelled." Pursuant to General Electric's suggestion the two types of contracts will be grouped separately, as they will receive different treatment.

The Government proposes that these contracts be declared and adjudged ille-

gal and in violation of Sections 1 and 2 of the Sherman Act. It maintains that as the Court is exercising the equitable remedy of rescission, it should make known its grounds therefor in the judgment. General Electric contends that as it has been decided not to include adjudications in the judgment this exception should not be made. This view has been accepted, for there is ample indication in the opinion in this case why these contracts should be terminated.

The domestic agreements listed are terminated in their entirety in language following General Electric's proposal with the addition of the word "renewal". Philips objected to the failure of the Government's proposal to limit its application to lamps, lamp parts and lamp machinery. In Philips' proposal, however, the foreign and domestic agreements were listed together as in the Government's. The force of Philips' objection is dissipated in classification of the agreements into domestic and foreign and the limitation of the effect of the judgment on foreign agreements.

The Government would also terminate the foreign agreements in toto, but as they deal not only with incandescent lamps but also with other products, and as these other aspects of the foreign contracts are being litigated in other suits, it is unnecessary and beyond the scope of this case to dispose of them here. Consequently, General Electric's proposal as to them is accepted, adding the word "renewing".

Subsection C incorporates the substance of a provision proposed by both the Government and General Electric with the addition twice of the words "or foreign patent", as agreed by the parties.

## Section V

### PATENTS AND TECHNOLOGY

*Dedication of existing patents on lamps and lamp parts.*

A. The defendants are each, jointly and severally, ordered and directed, forthwith upon entry of this Judgment, to dedicate to the public any and all existing patents on lamps and lamp parts.

■ Paragraph A is the Government's proposal, except that the provision as applied to lamp machinery is eliminated and the requirement for dedication goes only to patents for lamps and lamp parts. Licensing of patents on lamp machinery is treated separately in Paragraph B of this Section.

This direction is in an area left open by the decision of the Supreme Court in United States v. National Lead Co., 1947, 332 U.S. 319, 67 S.Ct. 1634, 91 L.Ed. 2077, which substantially diluted its pronouncement in Hartford Empire Co. v. United States, 1945, 323 U.S. 386, 65 S.Ct. 373, 89 L.Ed. 322, in which the Court determined that dedication as directed by the district court was confiscatory. In the National Lead case the Court said:

"While it has been contended that because of the decision of this Court in Hartford-Empire Co. v. United States, 323 U.S. 386, 65 S.Ct. 373, 89 L.Ed. 322, the District Court was not free in the present case to require the issuance of royalty-free licenses, we feel that, without reaching the question whether royalty-free licensing or a perpetual injunction against the enforcement of a patent is permissible as a matter of law in any case, the present decree represents an exercise of sound judicial discretion." 332 U.S. at page 338, 67 S.Ct. at page 1643, 91 L.Ed. 2077. Cf. United States v. Aluminum Co. of America, D.C.S.D.N.Y. 1950, 91 F.Supp. 333.

The foregoing language certainly casts a shadow on the ruling in the Hartford Empire case as being a hard and fast determination against royalty free licenses, and suggests, if indeed it does not invite, the application of such a measure when and where the circumstances of patent abuse prescribe it.

There is a distinction between the application of the Supreme Court's ruling in the Hartford-Empire case as it ad-

dresses itself to the licensing of existing patents on lamps and lamp parts of the defendants and the licensing of patents on lamp making machinery. I have held that General Electric's attempt to maintain control over the lamp industry has been largely by way of extending its basic patents on lamps and lamp parts. To compel the completely free use of these patents is not to impose upon General Electric and other defendants penalties for misuse of patents and violation of the antitrust laws, but rather to check the intrusion of advantages thereby gained into the mechanics of competition in the lamp industry.

Where the profit margin on the production of lamps is as narrow as it is at the present time any licensing fees may prove an important factor in limiting or inhibiting the growth of competition. In view of the fact that General Electric achieved its dominant position in the industry and maintained it in great measure by its extension of patent control the requirement that it contribute its existing patents to the public is only a justified dilution of that control made necessary in the interest of free competition in the industry.

In another instance in the case of United States v. Imperial Chemical Industries, D.C.S.D.N.Y.1952, 105 F.Supp. 215, the court followed literally the language of the Hartford Empire case and declined to order royalty free licensing. However, that case was based on violation of Section 1 of the Sherman Act. Violations of both Sections 1 and 2 have been found in this case.

General Electric and the other defendants are mounted upon an arsenal of a huge body of patents that can easily overwhelm and defeat competition by small firms desiring to stay in or gain a foothold in the industry. These operators may well be unequipped to engage in litigation on the validity of one patent after another at what could be incalculable expense. In order to avoid it they could be required to shoulder royalties which could prove to be the very factor that would push them out of the competitive circle of the market.

In the circumstances such as these it would appear that royalty free licensing of patents on lamps and lamp parts is an essential remedy as a preventive against a continuance of monopoly in this industry. It would appear to be no more objectionable as confiscatory than where compulsory licensing is ordered. In the latter case the owner admittedly is permitted to receive a royalty but he nevertheless loses a monopoly inherent in his ownership of the patent, and the royalty he is forced to accept at times is not one that he fixes. Royalty free licensing and dedication are but an extension of the same principle, not to be directed indiscriminately, of course, but well within the therapeutic measures to be administered under circumstances such as were made to appear in this case.

At a conference held September 21, 1953, concerned with the provisions of this judgment General Electric asserted a wide difference between a provision for the dedication of patents and for compulsory free licensing thereof. It vigorously opposed invoking the remedy of dedication. In this it was supported by other defendants.

The Government strenuously opposed any departure from the theory of dedication which it argued was equitable and feasible.

General Electric urged four main reasons why the application of a provision for dedication would be unfair and inequitable as follows:

First, manufacturers of products other than lamps would be benefited by such dedication which should not be within the contemplation of this judgment since it should concern itself only with the lamp field. Secondly, that Westinghouse and Corning should make available any patents they have of an existing character in reciprocation for grants by the defendants. Thirdly, that manufacturers who sought to practice the patents merely to make lamps for their own use should not profit by dedication. Fourth-

ly, that since the definition of patents includes applications a problem would arise as to how to dedicate an application, and that there would be no incentive to complete the prosecution of applications if they were to terminate in the futility of dedication. In each of these instances it was argued that royalty free licensing would accomplish all the necessary relief sought by dedication and without the above complications.

The first objection is met by the consideration that the abuse of patents relating to lamps and lamp parts was the basis for judgment against the defendants. These actions justified invalidation of the patents themselves and if their use in other fields now becomes practical it flows from the fact that all monopoly originally granted in the patent has been dissolved.

As to the second objection, Westinghouse and Corning terminated the case against them by giving consent decrees many years ago. In those decrees provision was made for drastic royalty free licensing of their patents among the other disabilities which were prescribed governing their conduct. In Section IV of the Westinghouse decree it was among other things, required to issue licenses "royalty free and without restriction as to the products to be treated or manufactured, * * * or as to the use to be made of such patents, * *." Under dedication as provided herein Westinghouse and Corning will, it is true, enjoy free access to defendants' patents in this classification. This is an advantage achieved by them by virtue of their accepting early the burdens of the decrees filed against them. Any inequities arising thereby may be said to be outweighed by the factor of advantage that may accrue, particularly to Westinghouse, in its engagement in competition with General Electric. The plea of Sylvania and Tungsol that failure to compel reciprocity by Westinghouse falls with particularly heavy inequity on them must be treated with considerable diminution from a practical sense. Over the years they could have had Westinghouse's patents which existed at the time of the Westinghouse decree on a royalty free basis, and while it is true that under the terms thereof they would be required to reciprocate by granting theirs, it must be remembered that at that time Westinghouse was in a position as the holder of patents to make many more grants than the smaller defendants. There seems to be no reason strong enough at this time to encompass Westinghouse and Corning in a judgment that would reform, or even partake of the nature of a change in the decrees which were entered against them in this case.

As to the third objection, that manufacturers who incorporate lamps in their products, such as airplanes or automobiles, will be able to practice dedicated patents and thereby enjoy unwarranted profit, much the same reasoning may be applied as in the case of the first objection, to wit, the use of the patents in fields other than lamp making. There is no inconsistency, as alleged by General Electric, in the provision for dedication and the provision which will follow in Section V, Subparagraph D (1) which permits a license to contain a provision that if the licensee manufactures lamps primarily for his own use including the use of the lamp as a component part of other products, the license shall be effective only as to lamps not so used. The latter subparagraph refers to future patents, while it is to be remembered that the requirement of dedication prevails only as to existing patents as defined in the judgment. As previously explained the validity of these has been impaired by their abuse. Consequently, the more drastic treatment with regard to their use is justified.

The fourth objection goes to the problem of dedicating applications for patents which come within the definition of patents as provided in the judgment. Admittedly the applicant may see fit to decline to prosecute his application in the light of the fact that it must terminate in dedication to the public. No more baleful or inequitable result occurs

here than in the dedication of the patent itself.

Sylvania further argued that under the definition of patents in the judgment there is included not only patents that are owned but those under which a party may have the right to grant licenses and that obviously one not owning the patent itself could not fulfill the direction to dedicate it. Of course, this is so, and a defendant can only be required to dedicate pursuant to this provision of the judgment such interest in the patent of which he may be possessed.

Philips objects to its inclusion in this patent dedication requirement on the basis that it was only peripherally associated with the conspiracy and that such inclusion constitutes an attempt by this court to regulate the economic policies of foreign nations where conduct proscribed by the antitrust laws is perfectly legal. The Government rightly contends that Philips is subject to the in personam jurisdiction of this court, that the decree in this respect purports to require licensing of Philips' United States patents, and that the court can and should provide effective relief for violation of the antitrust laws. As set forth in the opinion in this case Philips knowingly violated the United States antitrust laws. It is eminently appropriate that its United States patents be made available to the incandescent lamp industry as part of the program of restoring strong competitors, so long suppressed as a result of the conspiracy of which Philips was a part. It is, therefore, included in the requirements of Section V, Paragraph A.

General Electric's former "B" licensees also object to their inclusion in the patent dedication section. They contend, in substance, that they took General Electric licenses and agreed to those provisions found to violate the antitrust laws as a means of survival. They insist that they now constitute the best available sources of competition to General Electric and that this competition should not be weakened by requiring them to dedicate their patents to any applicants in the industry. While this argument has some force in relation to future patents, it is insufficient to warrant freeing the former "B" licensees from the requirement of dedicating existing patents. The "B" licensees as well as General Electric benefited from the illegal arrangement described in the opinion, and it is no coincidence, therefore, that they now provide stronger competition to General Electric than the firms which were not involved in the conspiracy. One reason for their success was access to General Electric patents relating to incandescent lamps in addition to whatever patents they themselves developed. It is reasonable to attempt to place the independent lamp manufacturers in as good a position to compete by making available to them all the patents that were available to the licensees. To this end, the former "B" licensees should be required to dedicate their patents as provided in Section V, Paragraph A.

### Licensing of patents on lamp machinery.

B. Each defendant is ordered and directed to grant, to the extent that it has the power to do so, to any applicant making written request therefor in connection with the manufacture by the applicant in the United States of lamps, lamp parts or lamp machinery a non-exclusive license under any, some or all of said defendants' patents on lamp machinery for their full unexpired terms to make, use and vend lamp machinery. A license shall also be granted to a United States applicant who contracts with a foreign manufacturer for construction for such applicant of lamp machinery to be used in the United States.

Although the requirements of free competition in the manufacture of lamps and their parts have necessitated the direction to General Electric and the other defendants to dedicate their existing patents on lamps and lamp parts, it would not appear that this relief is required with regard to freeing existing patents covering lamp machinery. Un-

questionably General Electric has made the greatest strides in the development of machinery for the manufacture of lamps. It has confined this manufacture for its own purposes and those of the "B" licensees exclusively. However, there are manufacturers adequately equipped to produce efficient machinery if access to patents held by General Electric and the other defendants (in only small measure) over such machinery is made available. Moreover, when General Electric will furnish blueprints of such machinery as will be hereinafter provided the ability of machinery manufacturers to produce satisfactory machines definitely will be assured.

In the interest of freeing United States applicants for machinery licenses, to order their machines constructed abroad for use afterwards in this country, provision is made in this section and hereinafter to immunize not only the applicant for the license but any foreign manufacturer who constructs the lamp machinery from liability for the infringement of United States patents or their foreign counterparts covering such machinery to the extent that he is filling an applicant's order.

General Electric's proposals contained a provision to the effect that a defendant need not grant a license under existing patents unless the applicant, upon request, agreed to license that defendant under any, some or all of its patents. General Electric contended that absent such a provision other members of the industry would be able to develop while blocking General Electric's development. It noted that Westinghouse and Corning, which have signed consent decrees, could demand patent licenses from General Electric, while the latter would be unable to compel them to reciprocate. It maintains that its position is supported by United States v. National Lead Co., supra, in which reciprocal patent licensing was ordered.

Inasmuch as provision has been made for dedication of existing patents on lamps and lamp parts, this proposal is pertinent only to provisions as to the licensing of patents on lamp machinery. As to these I am inclined to agree with the assertion of the Government that provision for reciprocal licensing would tend to perpetuate the situation of industry dominance by General Electric which the decree is designed to end. For many years General Electric conducted the bulk of the research in the industry. In addition, it received cross licenses in whatever patents were held by its licensees. To attempt to dissipate the effect of the great advantage which accrued to General Electric primarily, but also to its former licensees, and which must necessarily project itself into the future even after the formal termination of the illegal arrangements, it is advisable to require the defendants to license whatever machinery patents they have without possessing the correlative right to demand licenses in return. As a practical matter prohibition against demanding reciprocal licensing upon the part of the defendants will exclude the defendants only from the right to the developments made by independent lamp producers and machinery manufacturers, for they are entitled under the judgment to demand licenses from each other. Were General Electric granted the right of reciprocity, since it would be the overwhelmingly largest source from which to demand licenses, once again it would be in a position of being able to channel all developments through itself. Therefore the proposal of General Electric for reciprocal licensing will be declined. Precedent for this refusal is found in United States v. United States Gypsum Co., 1950, 340 U.S. 76, 93–94, 71 S.Ct. 160, 95 L.Ed. 89.

Consideration has been given to the proposals of General Electric, Sylvania and other defendants that a proviso should be added to this paragraph requiring Westinghouse and Corning to grant reciprocal licenses under their patents on lamp machinery as a condition to obtaining a license under a defendant's patents on lamp machinery. For reasons heretofore discussed in considering the defendants' objections to dedication the

proposal for reciprocal licensing by Westinghouse and Corning in this paragraph must be denied.

### Licensing of General Electric's future patents.

C. (1) General Electric is ordered and directed to grant, to the extent that it has the power to do so, to any applicant making written request therefor in connection with the manufacture by the applicant in the United States of lamps, lamp parts or lamp machinery, a non-exclusive license under any, some or all of said General Electric's future patents, as herein defined, and for their full unexpired terms, to make, use and vend lamps, lamp parts or lamp machinery.

### Reciprocity

(2) The provisions of this Section, however, shall not require General Electric to license any applicant, including any other defendant or Westinghouse Electric Corporation or Corning Glass Works, under any of its future patents, unless said applicant agrees upon request to grant to General Electric, upon a reasonable royalty and for the full unexpired term of each licensed patent, a non-exclusive license to make, use and vend lamps, lamp parts and lamp machinery under any, some or all, (as General Electric may request), of the patents and applications, if any, relating to lamps, lamp parts and lamp machinery owned or controlled by said applicant or under which it then has the right to grant licenses or sub-licenses.

Section V, Paragraph C relates to licensing of future patents. The Government proposed that all defendants be required to license for a reasonable royalty future patents. The former "B" licensees and Philips strongly objected to their inclusion in this provision, maintaining that once they had disassociated themselves from General Electric they constituted either actual or potential competition to General Electric and that the force of such competition should not be weakened by compulsory patent licensing of General Electric, as well as others. There is substance to this argument. By the time this decree is signed the prohibited agreements between General Electric and the other defendants will have been terminated for a substantial period of time, and the effects of the illegal practices should have begun to wear off. If these former licensees can develop new products and processes, it would be desirable that they carry them forward without the necessity of licensing, among others, General Electric. Having made available to the independent manufacturers the patents they were able to use while joined in the conspiracy with General Electric as well as those developed for a period after that time, it would seem that no more should be required of the defendants other than General Electric to place the independent producers in a competitive stance as to patents. Consequently, these defendants will not be required to license their future patents.

As to General Electric, however, different considerations govern. It maintains that it too should not be required to license future patents, on the basis that such a provision would tend to make the rest of the industry dependent on it and discourage other concerns from engaging in research. This possibility does not weigh as heavily as the fact that partly as a result of its past illegal behavior General Electric is far ahead of the other firms not only as to available technological developments but also as to research facilities. This is a matter which does not cure itself as soon as the actual illegal practices are stopped. As the Government points out, the momentum achieved carries on. As in the case of United States v. National Lead Co., supra, it is appropriate here to require this defendant to license, at reasonable royalties, patents acquired during a limited period following the judgment. This should operate to overcome some of the obstacles placed in the way of competitors by past illegal behavior.

As was indicated in the definition of "future patents" in Section II, Paragraph E, the Government proposed that the term include patents owned by any defendant within a period of ten years from the date of this judgment. The Government's contention that the effect of the conspiracy will not be eradicated as of the date of the judgment has been established, but, in view of the fact that General Electric terminated the objectionable agreements some time ago, it would seem that the definition of "future patents" should be restricted to include only those patents owned by any defendant within a period of five years from the date of this judgment.

Philips also objects to the provision that patent licenses under this Section are limited to applicants who manufacture in the United States, asserting that it would be required to license its patents to United States firms which manufacture in this country but that it could not take advantage of compulsory licensing itself, for its plants are outside of this country. While Philips can take advantage of the licensing provisions only if it contemplates manufacturing within this country, it is advisable as a practical matter that the judgment be so limited.

The Government would deny to General Electric as to future patents the right to condition its compliance with a request for patent licenses upon an applicant's agreement to license General Electric under any, some or all of its patents. Such a provision was not included as to existing patents, but as was noted, all the other defendants are subject to existing patent dedication requirements, and therefore no requirement for reciprocity was necessary in order to permit any defendant to obtain licenses from any other defendant. As to future patents, however, unless a provision providing for reciprocity is included, all of the defendants other than General Electric as well as independent producers will be able to acquire licenses from General Electric, but General Electric will be unable to acquire licenses from them. This is an unnecessary boon to these other defendants. As a result of the provisions relating to dedication or licensing of existing patents both the defendants and the independent firms will be assured of access to the technical developments of General Electric up to the date of the decree, for which, in the case of the independents, they will not have to surrender any patent licenses of their own. While it is advisable to permit competitors to have access to General Electric patents developed within five years of this judgment, it would not seem necessary to prevent General Electric from asking for licenses from an applicant in return. General Electric's proposal that it be permitted to condition licensing of its patents upon receipt of a license or licenses from an applicant will, therefore, be accepted as to future patents.

### License Regulations

D. (1) This Section, however, shall not prevent the inclusion, in any such license to make, use or vend lamps, of a provision that if the licensee is or becomes a person who engages in the manufacture of lamps primarily for use, (which includes the use of a lamp as a component part of other products or equipment) by or for him, his parent, subsidiary or affiliate, then such license shall be effective only as to lamps not so used.

(2) The defendants are each enjoined and restrained from including any restriction or condition whatsoever in any license or sub-license granted by them pursuant to this Section, except that each such license or sub-license may contain any, some or all of the following provisions: (a) a provision for the payment to the licensor of a reasonable, nondiscriminatory compensation in the nature of a royalty or otherwise (herein referred to as a "royalty"); (b) reasonable provisions for periodic inspection of the books and records of the licensee by an independent auditor, or by any other person

acceptable to the licensee and licensor, who shall report to the licensor only the amount of royalty due and payable; (c) reasonable provisions for cancellation of the license upon failure of the licensee to pay the royalties or to permit the inspection of his books or records as hereinabove provided; (d) that the license shall not be transferable; (e) a license under any patent or patents on lamp machinery may also contain a provision that such license does not grant to such licensee or his vendee any license or implied license under any patent on lamps or lamp parts, and that a notice to that effect shall be affixed by such licensee to each machine sold under such license; and (f) such other terms and provisions as this Court shall approve if application for such approval is made after reasonable notice to the Attorney General.

(3) Each license issued pursuant to this Section shall provide that: (a) the licensee may cancel the license at any time after one year from the initial date thereof by giving thirty (30) days' notice in writing to the licensor; and (b) the licensor shall notify each licensee of the issuance and terms of each license granted pursuant to this Section and each licensee shall have the right, upon written request, to exchange its license for any other such license granted by the licensor and involving the same patent or patents, in the event such other license be upon more favorable terms.

(4) Upon receipt by any defendant of a written request for a license under the provisions of this Section, such defendant shall advise the applicant, in writing, of the royalty which it deems reasonable for the patent or patents to which the request pertains. If the parties are unable to agree upon a reasonable royalty within sixty (60) days from the date such request for a license was received by said defendant, the applicant therefor may forthwith apply to this Court for the determination of a reasonable royalty, and said defendant shall, upon receipt of notice of the filing of such application, promptly give notice thereof to the Attorney General or the Assistant Attorney General in charge of the Antitrust Division. The reasonable royalty rates, if any, determined by the Court, shall apply to the applicant and to all other subsequent licensees under the same patent or patents. Pending the completion of negotiations or any such proceedings, the applicant shall have the rights requested under this Section to make, have made, use or vend under the patent or patents to which its application pertains without payment of royalty or other compensation as above provided, except as provided in Paragraph D (5) of this Section.

(5) Where the applicant has the right to make, have made, use or vend as provided in Paragraph D (4) of this Section, said applicant or the defendant may apply to this Court to fix an interim royalty rate pending final determination of what constitutes a reasonable royalty. If the Court fixes such interim royalty rate, such defendant shall then issue, and the applicant shall accept, a license or, as the case may be, a sublicense, providing for the periodic payment of royalties at such interim rate from the date of the filing of the application for a license. If the applicant fails to accept such license, or sublicense, or fails to pay the interim royalty in accordance therewith, such action shall be ground for the dismissal of his application, and his rights under this Section shall terminate. The reasonable royalty rate determined by this Court shall apply to the license granted to such applicant from the date of his application for a license, and may be charged to each subsequent licensee under the same patent

or patents, unless this Court shall fix a different rate of royalty upon application of any such subsequent licensee pursuant to this Section.

(6) Upon the written request of any person using patents pursuant to the provisions of this Section, any defendant, except Philips, to which such request is made shall grant to such person to the extent it has the power to do so, an unrestricted unconditional and non-exclusive grant of immunity from such by such defendant, with respect to any lamps or lamp parts made in the United States or sold under a patent used pursuant to the terms of this Judgment, under any foreign patents corresponding to the patent or patents used by such person, provided, however, that General Electric shall not be required to grant any such immunity to any licensee under its future patents, including any other defendant or Westinghouse Electric Corporation or Corning Glass Works unless such licensee, upon request, shall agree to give General Electric a reciprocal grant of immunity under such licensee's foreign patents, if any, corresponding to its United States patents, if any, under which said General Electric is licensed by it.

(7) If a licensee licensed pursuant to Section V, Paragraph B elects to have lamp machinery manufactured for it by a foreign manufacturer, the licensor shall to the extent it has the power to do so grant immunity from suit under corresponding foreign patents held by it to the foreign manufacturer on machinery manufactured for use by the licensee in the United States. This sub-paragraph D (7) shall not apply to Philips.

The Government objected to (f) of subparagraph D (2) on the ground, chiefly that it would tend to invite unnecessary delay in the consummation of license agreements but it conceded that under the reservation of jurisdiction provision in the judgment an avenue of court intervention could be opened. Under such circumstances the objection is substantially diluted and the subsection may be retained.

Regulatory provisions D (1), the balance of D (2), D (3), D (4) and D (5) are not in controversy substantially.

Subparagraph D (6) has been made applicable to persons using dedicated or licensed patents. As originally drafted, Philips argued that it would be required to grant to a licensee upon request an unrestricted, unconditional and non-exclusive grant of immunity from suit by it with respect to products made or sold under a license granted pursuant to this judgment, under any foreign patents corresponding to the patent or patents under which the licensee is licensed.

Philips claims that this requirement would have been illegal as an interference by a United States court in patent administration of the Netherlands. It would require Philips to license all American applicants, though it need not license applicants of other nationalities. Philips asserts that the provision is grossly unfair and is unnecessary to accomplish the purposes of the decree. It points out that other defendants are United States concerns whose foreign patents would be ancillary to their United States patents, and that immunities from suit under their foreign patents corresponding to their United States patents would apply only to articles made in the United States in competition with other American manufacturers.

As to itself, Philips continues, all its laboratories and other factories are located abroad, and whatever United States patents it has are ancillary to its foreign patents. This manufacturing conducted abroad competes with foreign concerns, some of which also engaged in the illegal activity described in the opinion in this case, but which will not be subject to the requirements of this judgment as to their patents.

The Government's position is that there is no doubt of the court's power to

compel licensing of Philips' United States patents, and that it follows that the power exists to require Philips to grant immunity from suit by it on its corresponding foreign patents in the event that United States manufacturers utilize Philips' United States patents and export the products made. The Government contends that without the requirement of a grant of immunity from suit by Philips, Philips could make compulsory licensing of its United States patents meaningless as far as foreign commerce is concerned. It states that Philips will not be required to do anything in respect to its Dutch patents, and that it will merely be required to refrain from using them so as to defeat the licensee's freedom to export.

The Government established that the conduct of Philips which violated the antitrust laws subjects it to the antitrust laws of the United States and that as the court has in personam jurisdiction over Philips it can grant effective relief against Philips, United States v. Sisal Sales Corp., 1927, 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042; United States v. National Lead Co., D.C.S.D.N.Y.1945, 63 F.Supp. 513, 524–525, affirmed, 1947, 332 U.S. 319, 67 S.Ct. 1634, 91 L.Ed. 2077; cf. American Banana Co. v. United Fruit Co., 1909, 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826. It does not establish that the particular relief it seeks against Philips in this paragraph is necessary to that end.

Philips, as it maintains, is in a different position from the United States defendants. It does not manufacture in this country, and, as a practical matter, does not offer actual, or within the near future potential, competition with General Electric or the other domestic manufacturers. It will not be able to utilize the compulsory patent dedication or licensing provisions to its own advantage since such dedication and licensing are applicable only to manufacturing within the United States. Its dominant interest is in its foreign patents, not in the ancillary patents it has taken out in the United States. The reverse is true of the American manufacturers, whose dominant interest is normally in their United States patents. Philips' activities are conducted in areas of the world where different standards of industrial behavior prevail than are acceptable in this country, but it is only where such activities overflow their proper boundaries so as to affect domestic and foreign commerce of the United States that it becomes a concern of this country to suppress them.

The great factor in the monopolization of the incandescent lamp industry grew out of the activities of the defendants in connection with United States patents as exploited by General Electric and its satellites. Philips' participation came about not so much through the patent avenue as by its direct agreements to allocate markets. Having in mind this and the relatively small potential of United States manufacturers exporting lamps it would hardly seem that any substantial contribution would be made to freeing competition in either domestic or foreign commerce by attempting in this judgment to compel Philips to place itself in the complicated situation of being required to grant immunity from suit on its foreign patents in so far as transactions in lamps outside of the limits of the United States are concerned. It would seem that Philips' contribution to the suppression of competition in this country would be undone in so far as patents are concerned if it is required to dedicate or license its existing United States patents on demand as is provided in Section V, Paragraph A.

Thus Philips will not be compelled to grant an immunity from suit with regard to products made or sold under a patent dedicated or licensed pursuant to the terms of this judgment under any corresponding foreign patents. Therefore the words "except Philips" have been added after the first appearance of the word "defendant" in Section V, Paragraph D(6).

The proviso in paragraph D(6) concerning reciprocity has been amended consistent with the holding heretofore

made that General Electric may demand reciprocal patent licenses only as to licensing of its future patents.

Paragraph D(7) has been inserted in order to insure freedom to United States manufacturers to purchase lamp making machinery abroad utilizing defendants' machine patents on the same basis as provision has been made for the manufacture of machinery domestically.

At the said conference of September 21, 1953, Philips proposed an additional provision to be added as subparagraph (8) requiring other defendants including Westinghouse and Corning to grant reciprocal licenses to Philips for any grants made by Philips as required in this section. The effort has been made to insulate Philips against interference with its normal business abroad except where its activities would have an appreciable effect upon the commerce of the United States. Competition in the United States would not be furthered by the reciprocity provision now sought by Philips as practical considerations militate against Philips' exporting its lamps to this country as has been discussed elsewhere in this opinion. Furthermore, fairness to Philips does not require the incorporation of this provision.

*Technological information on manufacture of lamps and lamp parts*

E. (1) Any manufacturer of lamps or lamp parts in the United States or person preparing to engage in such manufacturing who utilizes a dedicated patent, or patents, or who receives a patent license from General Electric covering lamps or lamp parts pursuant to this Section during a period of three years from the date of this Judgment may demand from it at any time during that three year period, at a charge covering costs, a written description (including copies of its blue prints and standardizing notices) of the methods and processes used by it at the date of the dedication or license in its commercial practice under the licensed or dedi-

cated patents in connection with the manufacture of lamps and lamp parts.

*Blueprints and technological information relating to lamp machinery*

E. (2) General Electric is ordered and directed to furnish or make available, at cost to any person engaged or preparing to engage in the manufacture of lamps or lamp machinery in the United States and who receives a license from General Electric pursuant to this Judgment, making a written request therefor within three years after the date of this Judgment, copies of any and all of its detail and assembly blueprints and drawings of such machinery developed or manufactured by or for General Electric and used by it at any time up to three years from the date of this Judgment in its commercial production of lamps in the United States, together with any and all equipment notices relating to such machinery, and the names and addresses of manufacturers of lamp machinery known to General Electric at the date of this Judgment, including the kind of machinery made by each manufacturer. Nothing in this Paragraph shall be deemed to prevent a United States manufacturer of lamps, lamp parts or lamp machinery from contracting with a foreign manufacturer to make lamp machinery for it for use in the United States utilizing such information as is obtainable in this subparagraph.

The Government proposed that General Electric should be ordered for a period of one year after the date of the judgment to furnish to any applicant copies of all standardizing notices and assembly blueprints used by it at the date of the judgment in the manufacture and assembly of lamps, lamp parts or lamp machinery and charge therefor no more than the actual cost of reproducing the same. It further proposed that within the same period General Electric

should prepare a manual containing complete technical information relating to its methods, processes and manufacturing techniques used by it in its production of lamps and lamp parts and a complete index of standardizing notices and machinery blueprints relating to the manufacture and assembly of lamps and lamp parts together with a notice stating that copies of machinery blueprints may be purchased upon request to General Electric at a cost not in excess of the expenses of General Electric.

General Electric is to be ordered to assign copyrights to the said manual and annual supplements thereto to the Library of Congress, Washington, D. C. It is to maintain the manual in a current manner for a period of five years after the date of judgment by the issuance of supplements at not more than annual intervals and for a period of five years after the date of the judgment is to furnish upon request at least one copy of the manual and annual supplements to any and all manufacturers of lamps, lamp parts or lamp machinery in the United States including any defendant. Provisions are proposed that in the event that the manual and supplements disclose information inadequate to enable a licensee of a patent, or patents, to utilize such patent, or patents, upon notice to General Electric the court may make such order for further disclosure of methods and processes as shall appear to be appropriate.

These proposals of the Government are deemed too broad. There would seem to be no necessity for the dedication of a book of General Electric's practices and procedures anticipating, as it were, requests for information that may or may not be made upon it. The language that I have adopted is more consistent with the narrower grants made by the courts and seems to afford a sufficient distribution of technical information to those who deserve and require it. The provision concerning information with regard to lamps and lamp parts in subparagraph E(1) follows the principle laid down in United States v. National Lead Co., supra, wherein the Court said:

"The requirement for the exchange of technical knowledge under the present decree is merely that included in paragraph 7, which is as follows:

" 'During a period of three years from the date of this decree such license or reciprocal license may at the option of either party contain a provision for the imparting in writing at a reasonable charge, by the licensor to the licensee, of the methods and processes used by the former at the date of the license in its commercial practice under the licensed patents in connection with the production of titanium pigments.'

The limited scope of this access to technical information is apparent. On the other hand, there is reason to believe that the knowledge which thus can be secured may be vital in giving value to the compulsory licenses which are a central feature of the decree." 332 U.S. at page 355, 67 S.Ct. at page 1651, 91 L.Ed. 2077.

Subparagraph E(2) is largely in the language offered by General Electric itself with regard to technical knowledge of lamp-making machinery. The changes consisted of requiring the information to be furnished at cost only and covering machinery developed or manufactured for a period of three years from the date of judgment. A proviso is also added to permit a manufacturer of lamps to contract with a foreign machinery manufacturer to construct lamp machinery for it to use in the United States utilizing the information authorized in this subparagraph.

The evidence in the case supported the view that competitors lacked technical information as to the building of lamp-making machinery. Present the machinery, it would appear that there would be no great impediment to the production of the lamps, and the provisions above

adopted appear to make adequate information available to appropriate parties.

The text of paragraphs E(1) and E(2) as above set forth reflects some changes urged by both the Government and General Electric at the conference of September 21, 1953, none of which, with but one exception, was particularly controversial. The exception existed in the Government's demand for the elimination in Paragraph E(2) of the word "assembly" between "lamp" and "machinery" and the words in parenthesis "(including coiling, flare making and base filling machinery)", so that General Electric would be directed by this paragraph to furnish or make available to qualified applicants the "know-how" of the manufacture of lamp machinery generally including thereby lamp parts not confined to lamp assembly machinery as provided in the original draft of the judgment. General Electric argued against broadening the direction to grant know-how of lamp machinery beyond the field of lamp assembly machinery because as it asserted, no evidence had been produced either in the hearings on relief or elsewhere in the case that any manufacturers required know how as to machinery other than lamp assembly machinery. Indeed, it argued, that, to the contrary, the evidence disclosed that certain manufacturers desired know how only as to assembly machinery and that others were quite competently providing their own lamp parts and machinery for making them. It complained that it would be exceedingly burdensome to be obliged to furnish know how for lamp assembly machinery and that this burden would be greatly magnified if the limitation of lamp assembly machinery were to be enlarged to lamp making machinery generally.

But notwithstanding the lack of evidence pin-pointed to specific individual necessity for the use of General Electric's know-how, the Government's argument is persuasive that it should be made available along with the grant of patent licenses for lamp-making machinery and that the direction to grant know-how for lamp machinery must be in the broad sense contemplated by the definition in Section II and not limited to lamp assembling machinery as it appeared in the original draft of the judgment prior to the conference of September 21, 1953.

*Injunctions relating to patents*

F. The defendants are each, jointly and severally, enjoined and restrained from:

(1) Instituting or threatening to institute, maintaining or continuing, any action, suit or proceeding under Sections 281 et seq., of Title 35, United States Code (1953), against any person for acts or infringement of existing patents on lamps or lamp parts.

(2) Instituting or threatening to institute any action, suit or proceeding under Sections 281 et seq., of Title 35, United States Code (1953), against any person for acts of infringement of such defendant's existing patents on lamp machinery alleged to have occurred prior to the date of this Judgment, except by way of counterclaim in any action brought by any person against said defendant.

(3) Making any disposition of patents or foreign patents, or rights thereunder, which deprives them, or either of them, of the power or authority to dedicate such patents or to issue the licenses, or grants of immunity, required by Section V of this Judgment, unless such defendant sells, transfers or assigns said patents or rights, and requires, as a condition of such sale, transfer or assignment, that the purchaser, transferee or assignee thereof shall observe the provisions of Section V of this Judgment with respect to the patents or rights so acquired, and the purchaser, transferee or assignee shall file with this Court, prior to the consummation of said transaction, an undertaking to be bound by the provisions of said Sec-

tion V of this Judgment with respect to the patents or rights so acquired. This provision shall not apply to the foreign patents of Philips corresponding to its United States patents.

(4) Conditioning the sale or lease of lamp machinery upon the grant by the purchaser or lessee thereof to such defendant of a right or option to repurchase or reacquire the same on the termination of a license under any patent or patents.

Subparagraphs F(1) and F(2) relate to suits by defendants upon existing patents. Insofar as such patents are dedicated, the Government's proposal in this respect is appropriate. Insofar as such patents are subject to compulsory licensing, General Electric's proposal should pertain. Therefore, to the extent that dedication is required, the Government's proposal has been adopted, and to the extent that licensing has been ordered, General Electric's proposal is incorporated in the judgment.

Subparagraph F(3) is substantially the proposal of the Government except that Philips is excluded from its regulation pursuant to its objection. Subjecting Philips to this provision would, as it argues, expose its European business to ruptures not necessary or required for the relief sought in this action.

Subparagraph F(4) was proposed by General Electric. It implements a holding of the Court on the subject of repurchase or recapture options in lease and sales agreements covering machinery.

At the conference of September 21, 1953, Sylvania asked for the elimination of Paragraph F(2) because it acted as a nullification of the right elsewhere granted under the terms of the judgment to the defendants to negotiate reasonable royalties with respect to licenses on lamp machinery. The date of the judgment, however, appears to be an appropriate time from which the defendants may enforce their rights as granted in the judgment and the proposal by Sylvania to eliminate this paragraph must be declined.

At the same time Philips proposed that it should be exempted from the operation of Paragraph F(4) since there was no evidence that it had engaged in the practice interdicted in the paragraph. However in the light of the general aspects of the case the measure is a reasonable precaution and should apply to all defendants including Philips.

The Government's proposed Subparagraph D(4) would restrain the defendants from "conditioning the grant of a license under any patent or patents, or of technical information, on lamps, lamp parts or lamp machinery, upon the grant or acceptance by the licensee of a license under any other patent or patents issued or to be issued." The manner in which the defendants are to utilize their patents and, in the case of General Electric, technical information, to promote competition in the lamp industry, has already been spelled out in this Section. It is intended that except where specified to the contrary, the defendants are to be free to use their patents and technical information as any independent lamp manufacturer may use his patents and technical information. The Government's proposed injunction in this respect goes much further and would, in view of its more comprehensive definition of "patent", perpetually deprive any defendant of the right to negotiate for a reciprocal license or exchange of patent rights with the owner of another patent. This is unnecessary to accomplish the purposes of the judgment, and consequently the Government's proposed Subparagraph D(4) will be rejected.

General Electric offered a substitute proposal embodied in its Subparagraph D(3), which would restrain the defendants from "conditioning the grant of a license under any patent or patents on lamps, lamp parts or lamp machinery upon the acceptance by the licensee of a license under any other patent or patents issued or to be issued upon lamps, lamp parts or lamp machinery, except where the exercise of the license requested would result in infringement of any such other patent or patents." Where this

judgment requires a defendant to license a patent upon a reasonable royalty, it is clear that no consideration or condition other than that royalty may be demanded. Hence this proposal would add nothing to what is already required of the defendants. For that reason it, too, will be omitted from this judgment.

The Government's proposed Section VIII, Paragraphs D(5) and D(6) are omitted on the grounds submitted by General Electric and other defendants. The provisions seek to regulate technical information and the sale of lamps, lamp parts or lamp machinery to an extent not warranted by the evidence in the case.

As a substitute for its proposed Section VIII, Paragraph D(7), the Government accepted a proposal urged by Westinghouse which is a modification of Subparagraph (7) and a supplementary Subparagraph (8). They read as follows:

"'D. The defendants are each, jointly and severally, enjoined and restrained from:

\* \* \* \* \* \*

"'(7) For a period of fifteen years after the date of this judgment, receiving or using rights under any existing or future license or other grant of rights from any licensor or grantor (domestic or foreign), or accepting a license or other grant of rights from any such licensor or grantor, with respect to any United States or foreign patent or patents or technical information relating to lamps, lamp parts or lamp machinery, or performing its own obligations to such licensor or grantor undertaken or to be undertaken in connection with such license or grant, unless such licensor or grantor undertakes to grant upon request similar licenses and rights, and perform such undertaking and grant, all upon reasonable and non-discriminatory terms and conditions, to any applicant in the United States, who shall have the right to apply to this Court for appropriate relief if the licensor or grantor shall fail so to perform; provided, however, that the foregoing provisions shall not prevent the continued use by any defendant, after a default by any such licensor or grantor in such undertaking, of rights or information received in good faith from such licensor or grantor and actually used by such defendant prior to such default; and provided further that, in the event of any dispute as to the compliance by any defendant with the requirements of this paragraph (7), such defendant may not be adjudged in contempt until after the determination of such dispute by this Court and the expiration of a period, in which to comply with such determination, of thirty days after such determination becomes final and binding against such defendant because of affirmance by the Court of last resort or expiration of the time for review of such determination.

"'(8) For a period of fifteen years after the date of this judgment, entering into any agreement, understanding or arrangement to acquire, in any manner, or acquiring, in any manner, pursuant to any existing agreement, understanding or arrangement, from any person engaged, directly or through subsidiaries, in the manufacture of lamps, lamp parts or lamp machinery, title to, or the right to grant licenses or sub-licenses under, any United States or foreign patent or patents, or technical information, relating to lamps, lamp parts or lamp machinery.'"

The Government and Westinghouse claim that this device is essential to give access to American manufacturers other than General Electric to foreign and domestic patents and know-how. Westinghouse particularly sought to show that European manufacturers were cold to their overtures for such licenses by reason of the over-powering influence of General Electric on the European market. The "B" licensees, especially Sylvania, joined General Electric in their resist-

ance to these regulations. In effect, they claim that this would be a completely impractical, unnecessary and harmful burden upon them. Philips likewise objected citing the particular hardships that would be visited upon it as a European manufacturer.

Sylvania apparently has been able to avail itself of arrangements with European firms, and I am constrained to agree with the objectors that the proposed requirements would go too far and could very well stifle exchange of technical information and patent licensing. With the requirement that no arrangement could be made with any defendant that would not be open upon the same basis to every other manufacturer of lamps in the United States, it is hard to conceive of a willingness upon the part of firms here and abroad to virtually tie themselves into such arrangements. I am persuaded that there is already room for competition with General Electric for access to licenses for patents and technical information, and in view of the other measures provided in this judgment means will be afforded for steady growth in this field. Of course, the power and influence built up by General Electric and IGE in their areas of foreign operations have created for them a position which was bound to attract to them European manufacturers seeking their good will. This trend it would appear has begun to dissipate and the exertion of energy and ingenuity upon the part of others than General Electric should bring them into free and rewarding competition with it.

The Government's proposed Section VIII, Paragraph E reads as follows:

"Defendant General Electric is enjoined and restrained from granting a license under any patent or patents, or technical information, on lamps, lamp parts or lamp machinery, unless it undertakes to grant similar licenses and technical information to any applicant upon reasonable and non-discriminatory terms and conditions."

It withdrew this proposal upon the condition that a provision is inserted in the judgment requiring General Electric to license patents for a period of ten years from the date of the judgment. It would appear that the five-year requirement for patent licensing is an adequate fulfillment of the ten-year condition, and consequently this provision will not be included in the Judgment.

### Section VI
### COMPETITIVE BIDDING AND TRADEMARKS

Defendant General Electric, in connection with any transaction involving public bodies or other purchasers upon a competitive bidding basis, is enjoined and restrained from:

A. Initiating, preparing or participating in, in any manner, any agreement, understanding, plan or program, regarding the terms or specifications of the invitation for bids to be issued by any such public body or other purchaser with the intent to influence or induce any purchaser of such lamps to (1) disqualify or discourage any other lamp manufacturer from submitting a bid, (2) limit the issuance of invitations to bid for such contracts to General Electric, (3) provide for the issuance of invitations or of notice in connection therewith specifying General Electric lamps by name, brand or their equal, (4) discriminate in the issuance of any such invitations or notices against any other manufacturer of lamps or (5) reject all bids submitted for such contracts and readvertise for new bids for such contracts.

B. General Electric is enjoined and restrained from making any use of the United States trade-mark "Mazda" in connection with more than 1% of its sales of lamps in any calendar year.

C. General Electric is enjoined and restrained for a period of three

years from the date of this Judgment from:

(1) Directly or indirectly authorizing any other person in the United States, to use in any manner, in connection with lamps not manufactured by or for General Electric, any United States trademark owned or controlled and used by General Electric in the United States in connection with lamps, except with respect to lamps sold by such person to General Electric;

(2) Using, in any manner, in connection with lamps manufactured by or for General Electric and sold in the United States, any United States trademark known by it to be owned or controlled and used by any other person in connection with lamps manufactured by or for such other person and sold in the United States, except where such sale is made by General Electric to such trademark owner.

This Section is a combination of the Government's proposed Section IX and General Electric's proposed Section VIII covering competitive bidding and trademarks as modified at the conference of September 21, 1953. I must decline to follow General Electric's suggestion that the provisions of Paragraph A shall apply to all defendants in their dealings with public bodies for the reason that with the exception of Westinghouse no defendant in this case was inculpated. It would appear reasonable to implement the findings contained in the opinion in this case with the above language set forth in Paragraph A insofar as General Electric is concerned, modifying the Government's proposal by eliminating reference to lamp parts, concerning which there were no transactions.

There is agreement on Paragraph B. I agree that Paragraph C as proposed by General Electric, is more precise than that proposed by the Government. Hence General Electric's language will be used.

## GOVERNMENT'S PROPOSED SECTION X DISTRIBUTION

### Paragraphs 1 and 2

In this Section the Government proposes a dissolution of General Electric's agency system of distributing its lamps. This was the subject of the Government's attack on the trial of the case. It resulted in findings by the Court that the system was valid under the decision of the Supreme Court in the 1926 case, United States v. General Electric, 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362. Now the Government proposes ingeniously that despite these findings the requirements of relief in this judgment justify the banning of the agency system even though it be considered valid and not in violation of the antitrust laws. I am persuaded that to follow the Government's proposal would be to do by indirection that which I have declined to do by direction. If the agency system is invalid it is so because it permits General Electric to engage in a form of price fixing in violation of the antitrust laws. If it is struck down there is little question but that retailers would be free to sell lamps at prices of their own choice. This can only be found by the Supreme Court in a holding affecting its former decision. Confronted with the same question in the form of a relief provision I must decline to grant the proposal now made by the Government to incorporate this proposal in the judgment.

### Paragraphs 3 and 4

Paragraphs 3 and 4 of the Government's Section X provide for injunctions restraining General Electric from price fixing and discriminating against purchasers of its lamps, lamp parts or machinery by reason of the engagement of the purchaser in dealing with such products of other manufacturers. Since I have found no basis for charges made by the Government against General Electric for such conduct and there is no reason to believe that it will in the future resort to expedients of this nature, these

provisions will not be written into the judgment.

## Section VII
## GENERAL INJUNCTIONS

A. The defendants with the exception of Philips, are each jointly and severally, enjoined and restrained from combining and conspiring, and from entering into, adhering to, renewing, maintaining, or furthering, directly or indirectly, or claiming any rights under, any contract, agreement, or understanding, with any other person engaged in the manufacture of lamps, lamp parts, or lamp machinery to:

(1) Allocate or divide fields, markets, customers, or territories, for the manufacture, sale or distribution of lamps, lamp parts, or lamp machinery;

(2) Fix, determine, maintain, adhere to prices, differentials, discounts, or other terms or conditions for the sale of lamps, lamp parts, or lamp machinery to be sold to or by third persons;

(3) Sell or distribute lamps or lamp parts pursuant to any sales or distribution plan, program or method;

(4) Reduce, restrict, or limit, in any manner, the kinds, quantities, sizes, styles, or qualities of lamps, lamp parts or lamp machinery which may be manufactured by any person;

(5) Exchange price lists, or any other information not generally available to the trade, relating to prices, costs, discounts, differentials, or other terms and conditions of sale of lamps, lamp parts, or lamp machinery, except in connection with a purchase or sale, or proposed purchase or sale of lamps, lamp parts or lamp machinery from or to such other person.

B. The defendants with the exception of Philips, are each jointly and severally enjoined and restrained from combining or conspiring, and from entering into, adhering to, renewing, maintaining, or furthering, directly or indirectly, or claiming any rights under, any contract, agreement, or understanding, with any other person, to:

(1) Sell, or cause to be sold, lamps, lamp parts, or lamp machinery, upon the condition or understanding that the purchaser thereof shall not resell the same, or that the purchaser thereof shall resell the same only in the United States;

(2) Reduce, restrict or prevent imports into, or exports from, the United States of lamps, lamp parts, or lamp machinery.

The provisions of this Paragraph B shall not apply to those provisions in a lamp agency agreement, (as herein defined), which pertain to the authority of the lamp agent to sell or otherwise dispose of lamps owned by the defendant appointing said agent.

C. Defendant Philips is enjoined and restrained from entering into any contract, agreement or understanding with any defendant or any other United States manufacturer of lamps, lamp parts or lamp machinery providing:

(1) that Philips refrain from exporting to or producing in the United States, lamps, lamp parts or lamp machinery; or

(2) that such defendant or other manufacturer refrain from exporting from the United States to any other country, lamps, lamp parts or lamp machinery produced in the United States.

■ I have accepted the Government's proposed Paragraph A, subparagraphs (1), (2), (3) and (4), with the following modifications: (a) Philips has been excepted from among the defendants in Paragraph A. As argued by it, application of these provisions in the light of its foreign manufacturing would complicate its existence beyond the ne-

cessities of this judgment. A separate paragraph referring to Philips is added in this section and will be commented upon below. (b) In Paragraph A(2), on the suggestion of General Electric, the words "influence, or attempt to influence" are deleted, since they are vague and not susceptible to reasonably certain definition.

In Subparagraph (4) General Electric objected to the use of the words "sizes, styles or qualities" as enjoining lawful activities toward essential and useful standards for products. I decline to excise these words since the reference in the paragraph is to reduction, restriction or limitation of the factors in question. It would appear that competition would be better served by the retention of the injunction as framed by the Government.

Subparagraph (5) proposed by General Electric has been substituted for the Government's Subparagraph 5 because it more precisely defines the word "information" and clarifies the provision so as to permit ordinary transactions in the purchase or sale or proposed purchase or sale of lamps, lamp parts or lamp machinery.

The Government's proposed Paragraph B with the elimination of Philips is accepted with the following modifications: (a) Subparagraph (2) is deleted on General Electric's objection as being contrary to the findings of the Court in the case, and not otherwise essential to the objectives of this judgment. (b) In Subparagraph (3), our Subparagraph (2), the final clause "by the use of patents or trademarks, or otherwise;" is deleted on the objection of General Electric. It appears that the wording of the subparagraph as accepted is broad enough to cover any effort by subterfuge to violate it by the use of patents or trade-marks without specific mention of them. The deletion avoids any misconstruction of the subparagraph in relation to legitimate agreements and licenses. (c) The Government's proposed Subparagraph (4) has been deleted, as lacking precision and as being susceptible of misapplication to lawful activities.

The proposal of General Electric, incorporated as our concluding clause in Paragraph B is consistent with the holding in this case that the lamp agency system of General Electric will not be terminated in this judgment. On the suggestion of Sylvania and Tungsol at the conference of September 21, 1953 it has been given general application to each defendant by the use of the last words in the clause—"Owned by the defendant appointing said agent".

General Electric's further proposal offered as "C" saving its rights under patents and usual business transactions not in restraint of trade or commerce is declined particularly in view of the treatment of its proposed provision entitled "Statutory Rights" dealt with in Section VIII hereof.

In Paragraph C part of Philips' proposal has been incorporated. Philips also proposed an additional paragraph specifically excluding contracts, agreements or understanding between Philips or any of its subsidiaries or between such subsidiaries and excluding application of the paragraph to the availability of patent or trade-mark laws to Philips or concerns dealing with it. This paragraph is declined as being too broad an exemption, susceptible of misinterpretation. It is held unnecessary to the protection of Philips in its legitimate pursuits particularly in view of the specific exception granted to Philips from the other defendants in this Section.

The defendants other than Philips object to being included in any of the provisions of this Section on the ground that in no instance were they found to have committed any of the acts sought to be enjoined and also because the Government's proposed restraint might expose them to hazards in their pursuit of legitimate business objectives. However, it appears that their conduct merits their inclusion in this Section. The deletions from the Government's proposals would seem to dissipate such hazards, and the Section appears justified as a means of closing off avenues of temptation in the future.

## Section VIII
## STATUTORY RIGHTS

Nothing contained in this Judgment shall have any effect with respect to operations or activities of any defendant which relate exclusively to acts and operations outside of the United States and which are not violative of the Anti-Trust Laws; nor shall anything contained in this Judgment prevent any defendant from availing itself of the benefits of the Act of Congress of April 10, 1918, commonly called the Webb-Pomerene Act, 15 U.S.C.A. § 61 et seq., or the Act of Congress of August 17, 1937 commonly called the Miller-Tydings Act, 15 U.S.C.A. § 1, or of any present or future Act of Congress, including, except as elsewhere provided in this Judgment, the Patent Laws.

The Government proposed that General Electric and IGE should be jointly and severally restrained from availing themselves in connection with lamps, lamp parts or lamp machinery of the benefits of the Webb-Pomerene Act, the Miller-Tydings Act and the Federal Trade Commission Act of 1951 subject to a proviso that upon the expiration of ten years from the date of the judgment the said defendants might apply to the Court for relief from the provisions of the section upon their showing that competition has been restored in the manufacture, sale and distribution of lamps, lamp parts and lamp machinery and that relief from the provisions of the section would not adversely affect such competition. General Electric objected that the defendants in this case had not been shown to have conducted themselves under those statutes in a manner which would justify the restraints from their benefits as proposed by the Government, and that the proposal was a punitive provision. It offered as against the Government's proposal a provision making clear that the judgment was not to prejudice the rights of the defendants under the legislation mentioned.

I have declined the Government's proposal and accepted the proferred provi-

sion of General Electric for the reasons stated by it and in the light of the fact that similar provisions were approved and ordered by the Supreme Court in Hartford Empire Co. v. United States, supra, 1945, 323 U.S. at page 430, 65 S.Ct. 373, 89 L.Ed. 322, and United States v. United States Gypsum Co., supra, 1950, 340 U.S. at page 103, 71 S. Ct. 160, 95 L.Ed. 89.

## DOMESTIC DIVESTITURE

One of the most controversial proposals which the Government asks be included in the final judgment is its demand that General Electric divest itself "of its plants, machinery, equipment and auxiliary facilities, representing one-half of its productive capacity measured by its average annual production for the years 1948 and 1949, for (1) the assembly of large lamps, (2) the assembly of miniature lamps, (3) the assembly of Christmas tree lamps, (4) the manufacture of glass and glass parts used in the manufacture of lamps, (5) the manufacture of bases used in the manufacture of lamps and (6) the manufacture of tungsten filament and leading-in wire used in the manufacture of lamps."

Though the Government proposes that General Electric file within six months of the date of the judgment a plan for this divestiture, the Government in its own brief and during the course of the hearings on the proposed judgment has indicated the outline of a plan by which it claims divestiture could be undertaken in a practical manner. It notes that from 1912 to 1925 General Electric operated its Lamp Department in two distinct divisions, each being integrated and each of which manufactured its own parts, conducted research and sold its own products through independent facilities. The separate engineering divisions were not united until 1930 and the sales divisions were not merged until 1931. In effect the Government contemplates the reversal of the subsequent coordination program. It asserts that research would not be affected because it does not insist on a division of the research program. It claims that restora-

tion of the two lamp divisions and divorcement of one of them from General Electric would not entail undue disruption, maintaining that General Electric has duplicate facilities and could effect the split of the lamp program by some shifting around of machines over a period of time.

It would leave to General Electric's judgment the planning of this division, but would require the construction of the two components so that they would be equally effective business edifices. General Electric would not know which member would be divorced and sold, for the Government would have that choice left to the Court after the division had been consummated.

The Government insists that competition can be restored to the incandescent lamp industry only by means of splitting General Electric's lamp production into two components, which would become independent concerns. It points to the size of General Electric as compared to the other producers of incandescent lamps, noting that as of the beginning of 1952 General Electric controlled about 60% of the business and earned about 90% of the profits. It claims that unless this enormous producer is cut down in size mere injunctions and the ending of the conspiracy between General Electric and its former licensees cannot prevent it from using its power to manipulate prices. The Government asserts that General Electric's figures indicating that by 1950 its relative position in the industry was declining and that the position of other producers was increasing are deceptive and that regardless of these figures, the fact remains that General Electric is in a position to destroy its competitors should it choose to do so.

To support its contention that General Electric can at will eliminate competition, the Government points out that in 1950 General Electric's profits from the sale of all incandescent lamps was $30,694,000. With this margin of profits, the Government maintains, General Electric could reduce the price of standard bread and butter lamps by 2 cents a lamp and still make a substantial profit. But such a reduction, which would have to be met by other producers, would transform their profit showing into a deficit, a situation which would ultimately drive them out of business. As an example the Government notes that in 1949 General Electric sold 356,124,000 lamps for general lighting, 150 watt and below. Had it sold each lamp for 2 cents less than the actual price, General Electric's revenue would have been reduced by $7,122,480. Deducting this figure from General Electric's consolidated profit for the Lamp Department in 1949 of $35,336,000 would leave General Electric a profit of $28,213,520 before taxes. On the other hand, had Westinghouse sold its 167,391,000 lamps, 150 watt and below, for 2 cents less in 1949, its receipts for that year would have declined by $3,347,820. In 1949 Westinghouse's profit from its lamp business was only $1,054,645 before taxes. At a price reduced by 2 cents Westinghouse would have had to have taken a loss of about $2,000,000 in order to maintain the percentage of the business which it enjoyed in 1949.

General Electric, of course, strenuously opposes the suggestion that its Lamp Department be split into two competing units. It justifies this position by the proposition that all the specific violations of the antitrust laws which the Court found can be eliminated by less drastic action.

General Electric insists that the evidence supports its contentions that it no longer holds an objectionable position of preeminence in the lamp industry and that the other lamp producers are strong, growing concerns able to provide effective competition. It claims that it no longer has control over or power to control Westinghouse, Sylvania or any of the ex-"B" licensees, and that its position must now be measured by its own business only. Figures are presented indicating that during the period between 1946 and 1950, inclusive, General Electric's percentage of the volume of domestic sales of all incandescent lamps has declined from 59.1% to 53.9% on a value basis and from 62.7% to 54.9%

on a quantity basis. This decline it maintains was absorbed by General Electric's competitors who increased their sales and have built new plants and equipment.

Furthermore, General Electric asserts that divestiture is not feasible. It claims that to reverse the process of coordination which was evidenced in the combination of the two lamp divisions would involve tremendous waste and inefficiency, especially as General Electric does not have duplicate facilities, as the Government maintains, in its various levels of production. Rather, production is specialized in the sense that most plants produce items not produced elsewhere. To create a new, independent lamp company would require the uprooting of machines, the disruption of production and distribution plans whose efficiency in the past has been demonstrated. Though the Government disclaims any intent to divest General Electric's research facilities, General Electric asserts that research would necessarily be impaired if it were devoted to a program of half its present size, causing great loss to the public and to the national defense effort. General Electric insists that employee benefit plans would be placed in jeopardy, causing a loss of morale and consequent impairment of General Electric's work.

■■■■ It is well established that the task before the Court in framing a judgment is to be "as effective and fair as possible in preventing continued or future violations of the Antitrust Act in the light of the facts of the particular case." United States v. National Lead Co., supra, 1947, 332 U.S. at page 335, 67 S.Ct. at page 1642, 91 L.Ed. 2077. Divestiture as a remedy "is not to be used indiscriminately, without regard to the type of violation or whether other effective methods, less harsh, are available." Timken Roller Bearing Co. v. United States, 1951, 341 U.S. 593, 603, 71 S.Ct. 971, 977, 95 L.Ed. 1199. Divestiture is, nevertheless, a recognized remedy and if such a drastic step is necessary to restore competition, it will be ordered even

though it is a painful experience to the defendant and its stockholders. United States v. Corn Products Co., D.C.S.D. N.Y.1916, 234 F. 964, 1018.

■■■ In situations where the defendant's violation of the antitrust laws consists of acquiring a monopoly in an industry by means of predatory practices, divestiture of the illegally acquired businesses has been considered an appropriate means of restoring competition by compelling a defendant to cough up its illegally acquired facilities, United States v. American Tobacco Co., 1911, 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663; United States v. E. I. Du Pont De Nemours & Co., 3 Cir., 1911, 188 F. 127. In the recent case of United States v. Crescent Amusement Co., 1944, 323 U.S. 173, 65 S.Ct. 254, 89 L.Ed. 160, the defendant motion picture exhibitors were found to have unreasonably restrained trade in motion picture films and to have monopolized the exhibition of films. The combination was found to have utilized its buying power in order to restrict the ability of competitors to license films and to have eliminated competitors by acquiring their property. Holding that divestiture was a proper remedy the Court stated:

"The Court has quite consistently recognized in this type of Sherman Act case that the government should not be confined to an injunction against further violations. Dissolution of the combination will be ordered where the creation of the combination is itself the violation. (Cases cited.) Those who violate the Act may not reap the benefits of their violations and avoid an undoing of their unlawful project on the plea of hardship or inconvenience. That principle is adequate here to justify divestiture of all interest in some of the affiliates since their acquisition was part of the fruits of the conspiracy." 323 U.S. at page 189, 65 S.Ct. at page 262, 89 L.Ed. 160.

Quite clearly the present case is not like those just cited, for even though

General Electric is the giant of the incandescent lamp industry, it did not, as was explained in the opinion in this case, achieve its position by such illegal means. Initially General Electric was the result of a merger of three firms which were exploiting the Edison patents. By control of these and later patents, General Electric was long able to maintain its position of supremacy in the industry. By the time the patents expired, General Electric had forged far ahead in the field, and at that point, in an effort to maintain its position, it engaged in most of the activities found to have violated the antitrust acts.

Divestiture, however, is not confined to depriving a defendant of the fruits of its illegal acts. In Schine Chain Theatres v. United States, 1948, 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245, the Supreme Court held that the trial court must make a finding as to what the defendant acquired by means of its predatory behavior, but it added:

> "While such an inquiry is the starting point for determining to what extent divestiture should be ordered, the matter does not end there. For it may be that even after appellants are deprived of the fruits of their conspiracy, the Schine circuit might still constitute a monopoly power of the kind the Act condemns * * *, in spite of the restrictive provisions of the decree. Monopoly power is not condemned by the Act only when it was unlawfully obtained. The mere existence of the power to monopolize, together with the purpose or intent to do so, constitutes an evil at which the Act is aimed." 334 U.S. at pages 129, 130, 68 S.Ct. at page 957, 92 L.Ed. 1245.

Consistent with this statement in the Schine case are the divestitures ordered in United States v. Aluminum Co. of America, D.C.S.D.N.Y.1950, 91 F.Supp. 333, and United States v. Pullman Co., D.C.E.D.Pa.1943, 50 F.Supp. 123, affirmed, 1946, 330 U.S. 806, 67 S.Ct. 1078, 91 L.Ed. 1263. In each of those cases the defendants owned all or nearly all of the industry in question. In neither case were there identifiable fruits garnered through violations of the antitrust acts. Yet in each case the court ordered divestiture as a means of furthering competition.

Divestiture in those cases, however, is readily distinguishable from the divestiture the Government now seeks. In both of them the business unit detached from the defendant corporation was already a separate corporate and economic entity. In the Aluminum Company case the defendant's stockholders were required to relinquish their shares in either Alcoa or in a strong Canadian aluminum concern which, if separated, would be in a position to compete effectively against Alcoa in the United States. In the Pullman Company case separation of the company providing sleeping car services from the company which manufactured sleeping cars was ordered. Such situations are a far cry from the relief sought here where the Government proposes to take apart a highly organized, unified business entity.

If the circumstances warrant it, however, this drastic remedy, even in the case of a unified business entity, may be called for. Though all the illegal practices which General Electric engaged in are enjoined by the decree, it is possible that its size alone might constitute a violation of the antitrust acts. United States v. Aluminum Co. of America, 2 Cir., 1945, 148 F.2d 416. If such were the situation divestiture might be necessary even though it resulted in the splitting of an economic entity.

> " * * * the final judgment must secure the establishment of those 'competitive conditions' which the Anti-Trust Acts, 15 U.S.C.A. § 1 et seq., demand. Dissolution is one remedy which may be necessary to that end; and in any event it will not depend upon the single issue whether 'Alcoa' at the time of the judgment shall have a monopoly of the ingot market. On the contrary, it will depend upon what is 'Alcoa's' position in the industry at that time: i. e., whether it must be divided into competing units in order to conform

with the law. The continuance of the monopoly in ingot aluminum may in the court's judgment be enough to justify dissolution; but its absence will forbid neither dissolution, nor any other remedy." United States v. District Court, 2 Cir., 1948, 171 F. 2d 285, 286.

There would appear to be no case in which divestiture was ordered where there were no recognizable fruits of behavior illegal under the antitrust acts and where the divestiture consisted of splitting a defendant which was a corporate and economic entity. Nevertheless, the various opinions in the Aluminum Company litigation indicate that under certain circumstances such a divestiture would be appropriate.

The inquiry in the type of situation which is presented here is whether or not competition exists in the industry in question and can reasonably be expected to continue to exist. If competition exists and gives promise of continuing, divestiture is unnecessary and therefore inappropriate. In United States v. National Lead Co., supra, the violation of the Sherman Act was found in patent pooling and in related agreements restraining interstate and foreign commerce. Affirming the district court's ruling denying the Government's request for a divestiture order which would require the defendants du Pont and National Lead each to submit a plan for the divestiture by it of one of its two principal titanium plants, together with the related physical properties, the Supreme Court stated:

"There is no showing that four major competing units would be preferable to two, or, including Zirconium and Virginia Chemical, that six would be better than four. Likewise, there is no showing of the necessity for this divestiture of plants or of its practicability and fairness. The findings of fact have shown vigorous and effective competition between National Lead and du Pont in this field. The general manager of the pigments department of du Pont characterized the competition with Zirconium and Vir-

ginia Chemical as 'tough' and that with National Lead as 'plenty tough.' Such competition suggests that the District Court would do well to remove unlawful handicaps from it but demonstrates no sufficient basis for weakening its force by divesting each of the two largest competitors of one of its principal plants. It is not for the courts to realign and redirect effective and lawful competition where it already exists and needs only to be released from restraints that violate the antitrust laws. To separate the operating units of going concerns without more supporting evidence than has been presented here to establish either the need for, or the feasibility of, such separation would amount to an abuse of discretion." 332 U.S. at pages 352, 353, 67 S.Ct. at page 1650, 91 L.Ed. 2077.

The Supreme Court noted that competition was already a reality in the National Lead case and that, therefore, divestiture was unnecessary. It should be observed, however, that in the situation pertaining in that case there were in existence two competing firms of approximately the same size and effectiveness. The present case involves an industry where one producer, General Electric, towers over other manufacturers of the product. In such a situation the existence of competition and the likelihood of its continuation if it does exist is still the key to the question of the necessity of divestiture.

■ The nature of the court's inquiry in the case where one producer is the predominant factor in a field is indicated by Judge Knox's exhaustive opinion in United States v. Aluminum Co. of America, supra, as it pertained to the proposal to divest Alcoa's domestic facilities. When the trial of the case ended in 1940 Alcoa was the sole producer of primary aluminum in the United States. Between that time and the date of the entry of judgment, great changes took place in the domestic aluminum industry. During the war a number of aluminum plants were built for the United States,

Alcoa expanded its own facilities, and Reynolds Metal Company, a new domestic producer, entered the industry. After the war the Surplus Property Board disposed of much of the Government's plant and equipment. The principal recipients of the surplus property were Reynolds Metal Company and a third producer of primary aluminum in the United States, Kaiser Aluminum and Chemical Corporation. With the industry thus constituted Judge Knox had to decide whether divestiture of Alcoa was required. He noted that competition was the key factor.

"The criteria applicable to this case as above described necessitate two basic inquiries: (1) whether competitors flourish, and the extent to which they flourish, and whether they do so at the sufferance of Alcoa; (2) whether a foreseeable change in market conditions can secure an alteration in Alcoa's present condition, either by expansion where any competitor can not, or by perseverance where any competitor would fail." 91 F.Supp. at pages 346, 347.

"Kaiser, along with Reynolds, has been a substantial beneficiary of the surplus property disposal program. The competitive abilities of these two firms, when compared to Alcoa, will largely determine the issues involved herein." 91 F.Supp. at page 355.

Judge Knox noted the relevant factors in evaluating the position of a defendant fighting against a Government divestiture proposal.

"In determining the extent of permissible power that is consistent with the anti-trust laws in a particular industry, the following factors are relevant: the number and strength of the firms in the market; their effective size from the standpoint of technological development, and from the standpoint of competition with substitute materials and foreign trade; national security interests in the maintenance of strong productive facilities, and maximum scientific research and development;

together with the public interest in lowered costs and uninterrupted production." 91 F.Supp. at page 347.

Thereupon Judge Knox examined in great detail the domestic aluminum industry and the potentialities of the competitive forces in it, concluding that despite the relatively weak positions of Reynolds and Kaiser with respect to Alcoa and in view of its disadvantages and doubtful value, domestic divestiture of Alcoa at that time would not be ordered, as Reynolds and Kaiser gave promise of remaining as competitors.

In the present case the problem is very similar to that in the Aluminum Company case after the war. General Electric is the giant in the field of incandescent lamps. Westinghouse and the former "B" licensees were at one time co-conspirators with General Electric in monopolizing the industry. That condition no longer exists, and other sections of this judgment will, among other things, enjoin practices found to have been illegal. There are now a number of lamp producers which are independent of General Electric and which constitute possible competitors. It is necessary to examine the position of these other lamp producers to determine if they give promise of providing continuing competition against General Electric or whether they are so weak and General Electric so strong that they cannot reasonably be expected to survive save at the sufferance of General Electric. If the former condition exists divestiture would not be necessary. If the latter exists, divestiture might be required.

Before examining the strength of competitive elements in the incandescent lamp industry it would be well to dispose of the Government's proposition that by the simple device of reducing the price of each lamp by 2 cents General Electric could still operate at a profit and would cause all other lamp producers to operate at a loss and thus could drive them out of business at will. Certainly the figures which the Government utilizes to reach this alarming conclusion are important factors, for relative profits and relative volumes of sales are among the elements

to be considered in determining if effective competition can prevail. The Government's simple mathematical computation, however, consisting of multiplying a year's output of lamps by 2 cents and subtracting the resulting figure from the year's profit in order to determine what the profit or loss would be were the price of lamps 2 cents less, is a most unrealistic approach. A vast number of interrelated factors would have to be considered in order to estimate the effect of a 2-cent price reduction on profits. If past experience be a guide, such a reduction would result in an increased demand for lamps. The extent of the increase would have to be estimated, as would the manner in which it would be apportioned among the various producers. The cost situation of each producer would have to be considered. Perhaps General Electric would be found to have reached the point of diminishing returns, so that an increased output would be less profitable to it; perhaps economies could be introduced by other producers if their output were greater.

There had been a series of price reductions in the past, after which other lamp firms continued to prosper. In 1942 a group of lamp manufacturers sought to intervene in this case to enjoin a price reduction of 3 cents per lamp then being put into effect by General Electric. The petitioners claimed that the reduction would put them out of business. Despite denial of the petition, the petitioners remain in the field. In sum, the Government's conclusion that General Electric could drive other lamp producers out of business by reducing its prices by 2 cents is so highly speculative and based on so few of the relevant factors necessary to reach such a conclusion that it cannot be considered a ground for divestiture.

Since the opinion in this case was filed most of the illegal practices in which the defendants were found to have engaged have been abandoned. Consequently, the lamp producers which were formerly tied to General Electric are now independent of that concern, and it is necessary to determine if they have the strength to provide competition in the incandescent lamp industry. In 1949 General Electric itself possessed total assets of $1,171,278,920. The next largest firm is Westinghouse, whose total assets amounted to $699,704,570. All of the former "B" licensees, with the exception of Kenrad which was purchased by Westinghouse, remain in existence. Their assets in 1949 were as follows: Sylvania—$69,920,977; Consolidated—$4,649,642; Tungsol—$8,282,830; and Chicago Miniature—$219,564. A number of other firms, referred to as the independents in the opinion in this case, also produce incandescent lamps.

The relative position of the major producers is revealed by certain tables prepared by the Government from the exhibits relating to relief.[2] From these tables it is readily apparent that General Electric still looms large in the industry, supplying in 1950 54.1% of the sales in dollars of all domestic incandescent lamps, 56.1% of the sales of large incandescent lamps, 53.4% of the sales of domestic miniature incandescent lamps and 64.8% of the sales of Christmas tree incandescent lamps. Nevertheless, a significant role is played by other producers. In 1950, measured by sales, Westinghouse produced 24.8% and Sylvania 10.6% of all domestic incandescent lamps. Of the sales of large incandescent lamps Westinghouse supplied 26.9% of the total and Sylvania 9.5% in 1950. Westinghouse produced 23.4% of all miniature incandescent lamps and Tungsol 19.8%. As to Christmas tree lamps, Westinghouse's share of sales in 1950 was 27%.

More important than the percentages of production in any given year is the indication that during the five years, 1946–1950 inclusive, General Electric's share of the business has declined while other companies have increased their share of the total. In 1946 General Electric supplied 58.8% of the sales of all domestic incandescent lamps and in 1950

2. See Appendix, Tables 1, 2, 3 and 4 attached hereto.

supplied 54.1%. In 1946 Westinghouse had 17.6% of the market, which increased to 24.8% in 1950. Sylvania's share rose from 7.7% in 1946 to 10.6% in 1950. This decline in General Electric's position is observable in the fields of large incandescent lamps, miniature lamps and Christmas tree lamps, and in each of those fields one or more other firms have registered increases. Perhaps the most notable change is in Christmas tree lamp production where General Electric's share declined from 75.2% in 1946 to 64.8% in 1950, and Westinghouse's share rose from 6.4% in 1946 to 27% in 1950.

The Government charges that this decline in General Electric's share of the market was artificially induced by General Electric for the purpose of preventing divestiture in this suit. This contention is not established by the evidence. It should be noted, however, that the increases in the percentage of sales of firms other than General Electric were not made entirely at the expense of General Electric. Much of the increase came from the decline in the relative significance of the independents, but the term "independent" should not be permitted to be illusory, for Westinghouse, Sylvania and the other "B" licensees for almost all purposes now and for all purposes under this judgment will be as independent of General Electric as any of the so-called "independents".

The Government points to General Electric's profits as compared with the profits of the other firms as an indication of General Electric's inordinate power in the lamp industry. Before federal income taxes in 1949 General Electric on a capital investment of $94,482,597 earned a profit of $36,007,057, or 38.1% on its capital investment. In the same year the figures for its former licensees were as follows: Westinghouse: capital investment—$47,103,665, profit—$1,390,406, percent of capital investment—3; Sylvania: capital investment—$8,500,000, profit—$234,478, percent of capital investment—2.8; Consolidated: capital investment—$1,889,915, profit—$187,857, percent of capital investment—9.9;

Tungsol: capital investment—$1,931,502, profit—$684,344, percent of capital investment—35.4; Chicago Miniature: capital investment—$210,730, profit—$768, percent of capital investment—.4. These figures suggest the tremendous earning power of General Electric. The figures concerning the percent of profit on capital investment, however, are of doubtful value, for, as General Electric has pointed out, there is no showing that all the firms used the same accounting methods.

An examination of companies other than General Electric in the incandescent lamp field shows that on the whole they are healthy, growing concerns. In 1945 Westinghouse purchased the lamp assets of Kenrad. In 1946 it purchased a site in Little Rock, Arkansas, and began construction of a lamp factory at Richmond, Kentucky. It has seven plants now as compared to three in 1939. Westinghouse's investment in fixed assets used in the lamp business increased from $7,099,000 in 1939 to $17,286,000 in 1949, an increase of 143.6%. In comparison, General Electric's increase was from $20,443,000 in 1939 to $44,053,000 in 1949, an increase of 115.5%.

Furthermore, the evidence indicates that Westinghouse is approaching a high degree of integration and self-sufficiency in the procurement of lamp components. It makes or has made for it all of the highspeed automatic machinery which it uses in the production of all kinds of lamps; it manufactures 94% of its requirements of lamp bases; it makes its own glass tubing and miniature bulbs; and it makes nearly all of its own wire for lamps. Westinghouse now sells lamp bases and wire to others in addition to using them in its own business, thus competing with General Electric in this field.

On a smaller scale Sylvania too has shown growth, not only in the fluorescent field but also in the production of incandescent lamps. Its investment in incandescent lamp facilities and sales has increased. It now produces more than its own parts and conducts more of its own research, having built new facilities to this end.

In its field, miniature and sealed beam lamps, Tungsol has, since the institution of this antitrust suit, undertaken extensive expansion of its plant and equipment. In 1946, for instance, it expended about $1,600,000, doubling its facilities over those possessed in 1941. It now makes some of its own machinery, buys some from outside sources, blows its own miniature bulbs and buys bases from Westinghouse and General Electric. In their own fields of the incandescent lamp industry other firms, such as Radiant Lamp Corporation and Consolidated, have demonstrated their ability to keep pace with modern developments.

Thus there now exist in the incandescent lamp industry some healthy, growing firms which are no longer tied to General Electric's apron strings. There is every indication that despite the fact that General Electric is by far the largest firm the others will continue to prosper and will remain as competitors of General Electric. In the Aluminum Company case Kaiser and Reynolds were in part somewhat artificial creations of the Government surplus property disposal program. Their financial positions were relatively weak. They were newcomers in a field long preempted by Alcoa. Yet the chance that they would continue to offer competition was considered good enough so that domestic divestiture was not required of Alcoa.

" * * * Unless fully persuaded —as I am not—that a divestiture of Alcoa's properties should take place, I am most reluctant to attempt to tamper unnecessarily with economic and industrial forces from which the public has reaped substantial benefits, and from which, also, it can continue to be served, and without detriment, in my opinion, to the national welfare.

"The vertical divestiture of an integrated concern so as to create, at a minimum, another fully integrated and effective competitor would be, in its nature, a highly speculative—and even hazardous—venture. A corporation, designed to operate effectively as a single entity, cannot readily be dismembered of parts of its various operations without a marked loss of efficiency." United States v. Aluminum Co. of America, supra, 91 F.Supp. at page 416.

If present competition and the promise of future competition be the criteria by which it is determined whether or not to order the divestiture of a defendant in an antitrust suit, there is far less reason to order General Electric to be divested than there was to order Alcoa to divest itself of a portion of its plant and equipment. For here there are many more than two competitors, and some of these competitors are established firms having long experience in production of lamps. They are financially sound and appear to be developing and growing.

There are other reasons why divestiture would be inappropriate in this case. In the first place, in spite of the Government's contention that splitting General Electric's Lamp Department into two parts would be the simple matter of re-creating the two lamp divisions abandoned in 1925, the evidence concerning the present organization of General Electric indicates that such divestiture would be an extraordinarily difficult and expensive undertaking. Since 1925 General Electric has labored successfully to create integrated lamp production, which labor would have to be undone to effect divestiture.

Duplication of manufacturing facilities exists primarily with respect to bread and butter lamps which are produced in four widely separated plants. The reason for this is that the plants were already in existence, it permits better geographical distribution of these high demand types, each plant supplying the warehouses nearest it, and it aids in keeping down the number of employees in each plant to the optimum number of 500 or 600. As for the thousands of others lamp products made by General Electric, duplication of manufacturing facilities is the exception, not the rule. For example, General Electric produces 206 types of bases. Of these, 189 are produced only at the Providence Base Works, 14 are produced only at the Con-

neaut Base Works, and the remaining three types are produced in both plants.

As a result of plant specialization, the various plants are dependent upon the services rendered to each other. For example the Mahoning Glass Works is the only plant at which pressed glass is made for sealed beam lamps. It supplies the pressed glass parts used at the Lexington Lamp Works and at Trumbull Lamp Works. Lexington Lamp Works assembles incandescent sealed beam automobile headlamps of the 4030 type. It receives its filament coils from the Trumbull Lamp Works.

A further reason to deny the Government's divestiture proposal is that the public would undoubtedly suffer were the plan implemented. Though General Electric has engaged in illegal conduct in the past, the fact remains that in addition to earning high profits it has served the public well. As a result of its research and efficiency the price of a 60-watt lamp was reduced from 45 cents in 1922 to 10 cents in 1942. The national defense effort relies heavily on General Electric's production and research. General Electric is now performing over 50 projects for the Government. These projects are dependent upon the availability of the unified facilities of General Electric for successful completion.

Apparently the Government recognizes the importance of leaving General Electric's research facilities intact, for it excepts them in its divestiture proposal, asking only that General Electric's manufacturing facilities be split. The Government does not explain, however, how half of General Electric's manufacturing plant will be able to support the same amount of research as is now engaged in. Absent such explanation, it must be assumed that General Electric's research would suffer from divestiture even though it was not itself divested.

Although the purchaser of the proposed divested unit would receive lamp for lamp, machine for machine, plant for plant duplicates of those remaining to General Electric, he would get no part of the research department. The new operator would face the old General Electric fortified not only by the retention of this asset of admitted prime importance but also with capital presumably, a not inconsequential sum, representing the amount he had paid for his purchase. Would a buyer undertake this risk? Could he survive as a successful competitor? On the other hand would he become so successful as to swallow up the old General Electric and thus become the new giant of the industry? Resolving all other doubts in favor of the Government would the only result be the addition of another firm's following the price lead of General Electric for lamps as is readily observable in other industries? These are only some of the imponderables to which the Government gives no answer, merely a reiteration of its abiding faith that the natural exercise of the immutable laws of free competition somehow will solve the problems that present themselves. The risk of the surgery suggested by the Government in the face of a national and world economy the future course of which is completely unpredictable does not commend itself as within the realm of the exercise of a reasonable discretion.

In sum, divestiture of General Electric is neither feasible nor in the public interest. There are now healthy competitors of General Electric in the incandescent lamp field, and these competitors give promise of thriving and growing in the future. The violations of the antitrust act which General Electric and the other defendants were found to have committed can be eliminated by means of the other provisions of the judgment and thereby as effective competition as is possible in an industry requiring great capital investment, research and knowhow can be preserved. As divestiture of General Electric is not necessary to foster competition, the Government's request therefor will be denied.

## Section IX
### FOREIGN INVESTMENTS

General Electric and International each is enjoined and restrained, so long as it holds a stock or any other financial interest in any foreign com-

pany (1) from receiving from such foreign company any assignment, license, right to sublicense, or grant of immunity under a patent, or from entering into any agreement with such foreign company to receive technical information from it, relating to lamps, lamp parts or lamp machinery, under, pursuant to or in connection with any agreement or understanding that other manufacturers thereof in the United States shall be denied access thereto, (2) from using its stock or other financial interest, or its representation on the Board of Directors of any foreign company to influence or to attempt to influence such foreign company to deprive such other manufacturers of access to any patent owned or controlled by such foreign company, or to any technical information of such foreign company, relating to lamps, lamp parts or lamp machinery, and (3) from using its stock or other financial interest, or its representation on the Board of Directors of any foreign company to prevent or to attempt to prevent such foreign company from entering into competition in the United States in the field of lamps, lamp parts or lamp machinery. Within thirty (30) days of the entry of this Judgment General Electric and International each shall notify each foreign company in which it holds stock or other financial interest of the terms of this Section and shall request such company to deal with applicants for licenses of patents or technical information relating to lamps, lamp parts or lamp machinery and with respect to competition in the United States precisely as if General Electric and International had no interest in the company.

This Section shall apply to all companies in which General Electric and International may take a stock or other financial interest in the future in which case the notice provided for in Subdivision (3) of the foregoing paragraph shall be given with-

in thirty (30) days after such acquisition and shall also be construed to apply to any individual or other business entity as well as corporations, provided, however, that this Section shall not apply to General Electric's or International's relations with their subsidiaries as defined in Section (2) of this judgment.

The opinion in this case found that IGE was the manipulator which brought the Phoebus Cartel into existence for the purpose of stabilizing the European market and preventing importation of incandescent lamps into the United States, and that General Electric's activities in the United States were geared to the Phoebus Agreement and were controlled by it. Thus the licenses granted by General Electric to Westinghouse and the former "B" licensees were framed so as to prevent export of lamps to Europe, the obligation imposed on General Electric in consideration for the European firms' avoidance of the United States markets.

To prevent the repetition of such a situation the Government proposes that defendants General Electric and IGE divest themselves of stock or other financial interests in competing foreign lamp, lamp parts or lamp machinery companies, excepting from the order foreign wholly owned subsidiaries. Canadian General Electric Company, Ltd., which is 95.4% owned by General Electric, would also be excepted from the order. As originally proposed the order would enjoin General Electric and IGE from ever acquiring less than the entire interest of any foreign company engaged in the lamp business. At the argument this suggestion among others was withdrawn.

Holdings of General Electric or IGE in nine foreign companies would be affected by such a provision. They are as follows:

1. *Soc. Riunite Osram-Clerici.* IGE obtained a 20% stock interest in this Italian company in 1950. Fifty percent of the stock is owned by an Italian Elec-

tric utility company and 30% by the distributor in Italy of IGE's radio and electronic products. IGE has no representation on the board of directors and the net worth of its equity was about $150,000 in January, 1951.

2. *General Elektrik Turk Anonim Ortakligi.* This Turkish investment dates from 1948. IGE owns 60% of the stock and designates three of the five directors. Turkish banking interests own 25% of the stock, and Vehbi Koc, head and principal owner of IGE's lamp distributor in Turkey, owns 15% thereof. The net worth of IGE's equity was $1,210,000 in January, 1951.

3. *Electromat SA.* This Chilean investment dates from 1945. IGE has a 29.8% stock interest and IGE's lamp distributor in Chile owns 23.85%. Between them they are entitled to elect 4 of the 10 directors and have a minority vote in respect to 5 others. Two Chilean Governmental agencies, and others, own the remaining 46.36% of the stock. The net worth of IGE's equity was $360,000 in January, 1951.

4. *Osram Konzern.* IGE has a 21.-45% equity in this unincorporated German concern. Other participants are a German electrical apparatus manufacturing firm, a German manufacturer of communications and other electrical equipment, and a subsidiary thereof, and a German utility company. The net worth of IGE's equity was $2,700,000 in January, 1951. Osram was one of the European firms that participated in the Phoebus agreement.

5. *United Incandescent Lamp & El. Co., Ltd.* The investment in this Hungarian company dates from 1921. On December 28, 1949, IGE owned 10.64% of the stock. Since that time the company has been virtually a nationalized concern in which IGE has no voting power, no directors and an equity of unknown value. This company participated in the Phoebus agreement.

6. *Compagnie des Lampes.* Investment in this French company dated from 1921. IGE owns 21.60% of the voting shares and 33.47% of the non-voting shares. It has no representation on the board of directors. In January, 1951, the net worth of IGE's equity in the voting shares was $510,000 and in the non-voting shares $580,000. This company participated in the Phoebus agreement.

7. *Philips Holding Company—Philips Lamp Works.* Investment in these Netherlands companies dates from 1920. The Holding Company has three classes of shares—priority (which are the control and directorship shares), preference and ordinary. IGE has no priority shares, .002% of the preferred shares and 3.28% of the ordinary shares. IGE has 6.03% of the ordinary shares of the Lamp Works. It has no representation on the board of directors of either company. As of January, 1951, the net worth of IGE's equity in the Holding Company was $200 in preference shares and $1,830,000 in ordinary shares and in the Lamp Works it was $3,405,000 in ordinary shares. Philips was a party to the Phoebus Agreement and, as indicated in the opinion, knowingly violated the antitrust laws of the United States.

8. *Tokyo-Shibaura Electric Co., Ltd.* Investment in this Japanese company dates from an investment in a predecessor company in 1905. As a result of war measures IGE now has no stock or representation on the board of directors. As of January, 1951, it had a recognized right to 56,232,703 yen and by a Japanese Cabinet Order has a right, upon payment of 626,726,550 yen, to re-establish the 24.11% participation which it had on November 30, 1941. The balance of the stock is held by the Japanese public. This company was a party to the Phoebus Agreement.

9. *Associated Electrical Industries, Ltd.* Investment in this British company dates from investment in British Thomson-Houston Co., Ltd., in 1894. IGE owns 10.15% of the preference shares with a voting power of 1.84%, and 33.33% of the ordinary shares with a voting power of 27.27%. IGE has designated one of the 15 directors. The net worth of IGE's equity in the preference shares was $760,000 and in the ordinary shares was $20,924,000 in January, 1951.

British Thomson-Houston Co., Ltd., was a party to the Phoebus Agreement.

The Government contends that these General Electric or IGE holdings lent themselves to consummation of the wilful and flagrant breach of the antitrust laws embodied in the Phoebus Agreement and its implementation. Divestiture of these holdings, it insists, is essential in order to prevent a repetition of such conduct. It is also deemed necessary to remove the possible restraint on competition with General Electric in the United States which partial ownership of and representation on the boards of these firms by General Electric and IGE may induce. Similarly, the Government contends, as long as General Electric has any ownership in these firms it will be tempted to use the influence resulting from such ownership to prevent foreign companies from exchanging research data and patents with the smaller American lamp firms. Furthermore, the Government argues that the aims of the United States foreign aid program would be furthered were foreign lamp companies to export to the United States and were United States lamp firms to export abroad, a development which would be encouraged were General Electric to surrender its holdings in foreign firms.

General Electric, on the other hand, insists that the Court found unlawful the agreements with foreign lamp companies and not the investments in certain foreign companies and that complete and effective relief can be given by injunction against making and adhering to agreements of the kind found to have been unlawful; further action in the form of forced sale of present holdings of partial interests in foreign companies would be unnecessary. In addition, General Electric contends that this proposal would conflict with the program of foreign aid, for it would discourage new General Electric investment abroad, where practical considerations often require an American firm to share ownership with natives of the country in which it invests.

Certain of the cases which the Government cites to support its demand for divestiture of partially owned foreign lamp companies are not particularly pertinent here, for they concern divestments required where the divested properties were the fruits of an illegal combination and where the acquisition was itself in violation of the antitrust laws, Schine Chain Theatres v. United States, 1948, 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245; United States v. Crescent Amusement Co., 1944, 323 U.S. 173, 65 S.Ct. 254, 89 L.Ed. 160. Neither do I believe that the case of United States v. Aluminum Co. of America, D.C.S.D.N.Y.1950, 91 F.Supp. 333, is helpful in the situation found here. In that case the same eleven stockholders possessed a majority of the shares of both Alcoa, the American firm, and Aluminum Limited, a Canadian firm, which was the largest producer of aluminum in the world. Judge Knox had declined to order domestic divestiture of Alcoa on the grounds that effective competition against Alcoa might reasonably be expected from Kaiser and Reynolds. But he concluded that joint control of the two giants, Alcoa and Aluminum Limited, not only tended to remove Aluminum Limited as a United States competitor of Alcoa, but it also was a threat to the very existence of the two fledgling United States firms which were to provide competition with Alcoa. Consequently the judgment required that the stockholders divest themselves of their stock in either Alcoa or Aluminum Limited.

The situation presented in the Aluminum Co. case is not paralleled here. Several of the lamp firms competing with General Electric are in strong positions, unlike Kaiser or Reynolds. None of the foreign firms in which General Electric has partial interests is in a position to sell in the United States market, and, together with General Electric, thus be in a position to threaten the existence of United States firms.

It is not disputed that, if the circumstances warrant it, the Supreme Court will sustain a district court order requiring a defendant in an antitrust case to divest itself of partially owned foreign companies. United States v. National

Lead Co., supra. The recent case of Timken Roller Bearing Co. v. United States, 1951, 341 U.S. 593, 71 S.Ct. 971, 977, 95 L.Ed. 1199, however, emphasized that such a divestiture is not to be required unless necessary to correct the situation caused by the violation of the law. Speaking in a concurring opinion, Mr. Justice Reed stated:

"What we have is an American corporation, dominant in the field of tapered roller bearings, producing between 70 and 80 percent of the American output. In 1947 its gross sales were over $77,000,000. This is a distinctive type of bearing, competing successfully for adoption by industry with other antifriction bearings. Timken produces about 25% of all United States antifriction bearings. As there were no findings of facts tending to show violation of the Sherman Act otherwise than through formal agreements for partition of territory, we assume appellant's conduct was otherwise lawful.

"In such circumstances, there was, of course, no occasion for the lower court to order any splitting up of a consolidated entity. Cf. Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619; United States v. American Tobacco Co., 221 U.S. 106, 31 S. Ct. 632, 55 L.Ed. 663. There has been no effort to create numerous smaller companies out of Timken so that there will be no dominant individual in the tapered roller bearing field. The American company had had a normal growth and development. Its relations with English and French Timken were close and American Timken had stock and contracts for further stock in both foreign companies of value in the development of its foreign business. Such business arrangements should not be destroyed unless necessary to do away with the prohibited evil."

In the present case I am inclined to follow the result in the Timken case, for it appears that not only is the Government's proposal unnecessary to end the prohibited evils but it also is not consistent with the present economic foreign policy of the United States.

Of the foreign firms which the Government's proposal would affect, three, the Italian, the Turkish and the Chilean, were not acquired by General Electric or IGE until long after this case had been instituted, and in no way had they any bearing upon the Phoebus Agreement. As has been indicated, the other foreign firms affected by the Government's proposal did participate in the Phoebus Agreement. Other foreign firms in which General Electric and IGE had no interest, however, were members of the cartel formed by the Agreement, and while the fact that General Electric and IGE partially owned some of the members may have facilitated the Agreement, such partial ownership was not necessary in order to consummate the Agreement. Other portions of this judgment will restrain General Electric's and IGE's practices abroad with respect to restricting competition in the United States. This Section will govern their conduct as regards foreign firms which they partially own. As a practical matter, I do not believe that the sale of such partial interests would contribute materially to the desired result of promoting competition in this country.

In addition, requiring divestiture of partially owned firms at this time would definitely run counter to the announced policy of the United States to encourage American capital to invest abroad. The Government itself recognizes the importance of this matter as evidenced by the withdrawal of that part of its proposal which would, among other things, restrain future foreign investments by General Electric or IGE. Logically, it would seem that recognition of the value of future foreign investments betokens a recognition that it is desirable that existing foreign investments remain intact rather than being sold, a step which would entail withdrawal of American capital from abroad and nullification exchange-wise of an equivalent amount of

investment in the foreign country involved.

To counter this the Government suggests that with General Electric's and IGE's interest in foreign lamp companies withdrawn, these foreign companies would be freed to export to the United States, thus improving foreign trade balances. As matters now stand, United States manufacturers have been freed by this judgment to export lamps, and there is no reason to believe that, were economic conditions propitious, foreign firms would refrain from exporting to the United States. I am constrained to believe that it is not General Electric's or IGE's partial ownership of these foreign firms which mitigates against export by them to this country. Rather it is the various economic and political barriers which stand in the way of such trade, matters over which courts have no control.

The recent case of United States v. Imperial Chemical Industries, D.C.S.D. N.Y.1952, 105 F.Supp. 215, does not dictate that divestiture should be ordered here. There divestiture of foreign companies owned jointly by United States and British corporations which had conspired to divide the world market in explosives and chemicals was ordered, but in that case the jointly owned foreign firms were organized for the specific purpose of doing the unlawful acts, which was not the basis of General Electric's and IGE's foreign investments.

Consequently the Government's proposal that General Electric and IGE be divested of foreign companies which they partially own will be denied. In its place, however, will be substituted this Section IX, a modification of General Electric's proposal governing certain of its and IGE's conduct in respect to partially owned foreign lamp companies.

General Electric's proposal has been changed in a number of respects. It is made applicable to any foreign company other than their subsidiaries as defined in Section II of this judgment in which it or IGE has a partial interest and is not confined, as suggested, to those partially owned companies which participated in the Phoebus Agreement. This is necessary in order that the judgment be fully effective.

A provision has been added restraining General Electric or IGE from preventing or attempting to prevent partially owned foreign companies from entering into competition in the lamp industry in the United States. This is included on the theory that it may in the future become feasible for foreign firms to compete in this country.

General Electric and IGE are required to notify partially owned foreign firms, within 30 days of this judgment, of the terms of this Section and to request that they deal with applicants for patent licenses and technical information relating to lamps, lamp parts and lamp machinery as if General Electric and IGE had no interest. In addition, provisions have been added specifying that this Section applies to partial ownership of companies acquired in the future, that it applies to any foreign partially owned business entity, whether a corporation or otherwise. These added provisions were deemed necessary to insure that General Electric and IGE will not engage in encouragement of discriminatory practices by partially owned foreign firms other than those which participated in the Phoebus Agreement.

As originally proposed in the Draft of Judgment considered at the conference of September 21, 1953, this section would have applied to all partially owned corporations excluding only wholly owned subsidiaries of General Electric or IGE or those in which they owned all the stock except nominal shares outstanding. At the conference General Electric protested that the breadth of such a limitation would work undue hardship in the relationships with their foreign subsidiaries as defined in Section II of the Judgment (where more than 50% of the stock is owned). The Government opposed any change in the Section as originally drawn asserting that by association of General Electric or IGE in relation with other owners, such as another defendant in this case, where they would own a bare 51% of the stock they would

escape from the safeguards set up in this Section. In such case, however, the entity would come within the definition of subsidiary as contemplated in Section II of this Judgment, and would be subject to all the restraints imposed by the general injunctions contained therein. In the provision as originally written General Electric's objection would appear to have justification and relationships with foreign subsidiaries could not be maintained in practice. Hence the Section was reformed to meet this objection.

The Government also called attention to the fact that this Section does not touch four signatories to the Phoebus Agreement, namely, Anderson, Meyer and Co., Ltd., Australian General Electric Co., .Ltd., General Electric Co. of Cuba and Cia. Mexicana de Lampara Elec., S.A. (Mexico). The respective stock interest of General Electric in each of these foreign companies represented by voting power was 84.1%, 100%, 100% and 66.7%. These subsidiaries will, therefore, be governed by the general provisions of the Judgment since they come within the definition of subsidiaries.

## Section X

### ACCESS OF DEPARTMENT OF JUSTCE TO RECORDS AND INTERVIEWS; REPORTS

A. Except as to Philips, for the purpose of securing compliance with this Judgment, duly authorized representatives of the Department of Justice shall, on written request of the Attorney General or an Assistant Attorney General, and on reasonable notice to any defendant, made to it at its principal place of business, and subject to any legally recognized privilege (1) be permitted reasonable access, during office hours, to all books, ledgers, accounts, correspondence, memoranda and other records and documents in the possession or under the control of said defendant, relating to any matters contained in this Judgment, and during the times that such representatives shall have such access, counsel for said defendant may be present, and (2) subject to the reasonable convenience of said defendant, such representatives shall be permitted to interview officers or employees of said defendants regarding any such matters, at which interviews counsel for such officers or employees interviewed and counsel for said defendant may be present.

B. For the purpose of securing compliance with this Judgment, duly authorized representatives of the Department of Justice shall, on written request of the Attorney General or an Assistant Attorney General and on reasonable notice to the defendant Philips made to the principal office of the defendant, be permitted, subject to any legally recognized privilege,

(1) reasonable access, during office hours, to all such books, ledgers, accounts, correspondence, memoranda, and other records and documents of the defendant Philips as may then be located in the United States in the possession or under the control of the defendant Philips, relating to any matters contained in this Judgment, and during the times that such representatives shall have such access, counsel for said defendant may be present;

(2) subject to the reasonable convenience of the defendant Philips and without restraint or interference from it, to interview such officers or employees of the defendant Philips as may be in the United States, who may have counsel present, regarding any such matters, and the defendant Philips, on such request, shall submit such reports in respect of any matters as may from time to time be reasonably necessary for the proper enforcement of this Judgment.

C. Information obtained pursuant to the provisions of this Section shall not be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of

the Department of Justice, except in the course of legal proceedings to which the United States is a party, or as otherwise required by law.

 Paragraph A is accepted as submitted by General Electric, and is identical with the proposal of the Government except for a provision for the presence of counsel and the deletion of the last sentence in the Government's proposal which provided for reports to be made to the Attorney General, the like of which were disapproved in United States v. Bausch & Lomb Co., 1944, 321 U.S. 707, 725, 64 S.Ct. 805, 88 L.Ed. 1024. Philips is excepted from this paragraph but is dealt with in the following Paragraph B.

I am persuaded that international complications posed by the provision for investigation of Philips in the Netherlands, as argued by Philips, make the application of the foregoing Paragraph A to Philips impractical. The suggestions made by Philips go about as far as they can. They have been incorporated in the judgment under these circumstances in Paragraph B with one modification. The words "and for no other purpose" following the first phrase in the said paragraph have been deleted as unnecessary. It is realized that the provisions can be frustrated by the removal from the United States by Philips of representatives and records, books and documents but this is inherent in Philips' position as a foreign manufacturer. On the other hand, if Philips changes its status and enters this country for the purposes of manufacturing, distribution or otherwise engaging in physical competition in the lamp industry here, then provision has been made for the right of the Government to make application to have Philips brought under more suitable regulations as will be found in Section XI entitled "Activities of Philips".

## Section XI
## ACTIVITIES OF PHILIPS

A. Philips shall not be in contempt of this Judgment for doing anything outside of the United States which is required or for not doing anything outside of the United States which is unlawful under the laws of the government, province, country or state in which Philips or any other subsidiaries may be incorporated, chartered or organized or in the territory of which Philips or any such subsidiaries may be doing business. In any such case, Philips shall advise the plaintiff thereof as promptly as is practical and thereupon the plaintiff may apply to the Court, with full opportunity to the defendant Philips to be heard for such relief consistent with the provisions of this Judgment as the Court may deem proper.

B. In the event that Philips shall enter the United States for the purpose of manufacturing, selling, distributing or otherwise competing in commerce in the United States in lamps, lamp parts or lamp machinery, the plaintiff may make application to have Philips subjected to such provisions of this Judgment as govern the other defendants as will be appropriate to Philips' new circumstances.

Paragraph A is proposed by Philips as a safeguard to its protection from being caught between the jaws of this judgment and the operation of laws in foreign countries where it does its business. It appears warranted for this purpose and has accordingly been incorporated in the judgment.

Paragraph B has been incorporated for the purpose mentioned in the foregoing Section X.

In the light of the elimination of Philips from the operation of the Government's proposed Section VIII B7 and the safeguards granted to it in this Section and otherwise in this judgment, its proposed Section XV for further assurances is deemed unnecessary.

At the conference on September 21, 1953 Philips registered objection to Paragraph B of this Section contending that if, in the future, it commenced to do business in the United States it should be subjected to nothing more than the

requirements of adhering to the antitrust laws as they apply to others. The Government urged that the paragraph should be retained, asserting that it should not be required in such event to institute proceedings anew against Philips for incidents which flowed from the basis of this suit. Since the Government's position seems well taken the paragraph will be retained.

## Section XII
### RETENTION OF JURISDICTION

Jurisdiction of this cause is retained for the purpose of enabling any of the parties to this Judgment to apply to the Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Judgment, for the modification or termination of any of the provisions thereof, for the enforcement of compliance therewith and for the punishment of violations thereof.

The above proposal is undisputed, conventional, and therefore incorporated in the Judgment.

## Section XIII
### OPINION AS FINDINGS

The opinion of the Court, filed herein on the 2d of October, 1953, is adopted as further findings of fact upon the evidence submitted at the hearing on remedies and for interim relief.

This Section was proposed by the Government at the conference of September 21, 1953 and provides that this opinion shall be regarded as findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure.

### INTERIM RELIEF

A final matter which should be disposed of is the Government's request for "interim" relief in the form of requiring General Electric to sell or lease to two independent manufacturers units of lamp-making machinery on terms fixed by the Court. Solar Electric Corporation, which manufactures a so-called "insect repellent" lamp and which also distributes incandescent lamps through an affiliate, Certified Electric Company, seeks two units of General Electric automatic machinery for miniature lamps and five units for large incandescent lamps. Save Electric Corporation, which at one time manufactured an "insect repellent" lamp and now specializes in a green lamp, Verdaray, and an infra red lamp, Penetray, would like to have eight units from General Electric in order that it can manufacture bread and butter lamps up to 150 watt. Representatives of each company testified that they could not obtain machinery equivalent to that used by General Electric and its former licensees and consequently could not compete with them. The Government urges that this situation be remedied by making units of General Electric available to them and thus furthering competition in the lamp industry.

It would seem, however, that other sources of automatic lamp machinery are available to Solar and Save. Such companies as Standard Tool & Machinery Co. and Barth Stamping and Machine Works are in a position to make such machinery and other competitors have bought machinery from them. The judgment will provide that General Electric's blueprints for lamp machinery shall be made available to the industry, and Solar and Save may use them in ordering such machinery as they desire. This relief will now be open to all competitors of General Electric and renders unnecessary the preferential treatment of Solar and Save on a basis of compelling General Electric to furnish them with machinery, particularly since it does not build machinery for sale.

As set forth under Section XIII this opinion shall constitute findings of fact and conclusions of law upon the evidence taken and arguments made on the questions of remedies and interim relief in this case. A final judgment in the form herein shall be submitted for signature.

EXHIBIT A
Domestic Contracts Referred to in
Section IV–A.

(1) Agreement between General Electric Company, Corning Glass Works, Empire Machine Company and American Blank Company, dated January 1, 1921 (Exh. 555–G).

(2) Assignment, General Electric Company to American Blank Company, dated January 1, 1922 (Exh. 559–G).

(3) Sublicense, American Blank Company to General Electric Company, dated January 2, 1922 (Exh. 560–G).

(4) License, American Blank Company, General Electric Company and Corning Glass Works to Westinghouse Electric & Manufacturing Company, dated January 1, 1927 (Exh. 782–G).

(5) Agreement between General Electric Company, Corning Glass Works, Empire Machine Company and American Blank Company, dated June 30, 1928 (Exh. 519–G).

(6) License, General Electric Company to American Blank Company, dated June 30, 1928 (Exh. 521–G).

(7) Agreement between Corning Glass Works and General Electric Company, dated June 30, 1928 (Exh. 539–G).

(8) Agreement between Corning Glass Works and General Electric Company, dated November 1, 1935 (Exh. 540–G (amending Exh. 539–G) ).

(9) License, General Electric Company to Corning Glass Works, dated June 30, 1928 (Exh. 1107–G).

(10) Agreement between General Electric Company and Corning Glass Works, dated November 1, 1935 (Exh. 1108–G (amending Exh. 1107–G) ).

(11) License, General Electric Company to Corning Glass Works, dated June 30, 1928 (Exh. 1109–G).

(12) Agreement between General Electric Company and Corning Glass Works, dated January 1, 1935 (Exh. 1110–G (amending Exh. 1109–G) ).

(13) License, Corning Glass Works to General Electric Company, dated June 30, 1928 (Exh. 1075–G).

(14) Agreement between General Electric Company and Corning Glass Works, dated June 30, 1928 and amendments thereto to January 1, 1940 (Exh. 570–G).

(15) Sublicense, American Blank Company to General Electric Company, dated July 1, 1928 (Exh. 523–G).

(16) Agreement between General Electric Company, Corning Glass Works, Empire Machine Company and American Blank Company, dated January 1, 1930 (Exh. 2178–G), (also 518–G; 555–G and 1153–G).

(17) Sublicense, American Blank Company to General Electric Company, dated May 8, 1930 (Exh. 2177–G).

(18) License, American Blank Company to General Electric Company, dated September 25, 1933 (Exh. 526–G).

(19) License, Corning Glass Works to General Electric Company, dated September 25, 1933 (Exh. 527–G).

(20) License, General Electric Company to Corning Glass Works, dated September 25, 1933 (Exh. 528–G).

(21) Agreement between Corning Glass Works and General Electric Company, dated November 1, 1935 (Exh. 529–G (amending Exh. 527–G) ).

(22) Agreement between General Electric Company and Corning Glass Works, dated November 1, 1935 (Exh. 530–G (amending 529–G) ).

(23) Agreement between Corning Glass Works and General Electric Company, dated February 13, 1934 (Exh. 531–G).

(24) Agreement between General Electric Company, Corning Glass Works, Empire Machine Company and American Blank Company, dated November 1, 1935 (Exh. 520–G).

(25) Agreement between General Electric Company and Westinghouse Electric & Manufacturing Company made as of January 1, 1927 (Exhibit 25–G) and any and all amendments thereto.

(26) Agreement between General Electric Company and Westinghouse

Electric & Manufacturing Company, dated January 1, 1927 relating to the trade mark "Mazda" (Exhibit 26–G) and any and all amendments thereto.

(27) Agreement between General Electric Company and Hygrade Sylvania Corporation, dated August 1, 1933 (referred to in Exhibit 27–G) and any and all amendments thereto.

(28) Agreement between General Electric Company and Consolidated Electric Lamp Company, dated July 1, 1933 (referred to in Exhibit 27–G), and agreement extending said agreement dated July 1, 1939 (Exhibit 28–G); and any and all amendments thereto.

(29) Agreement between General Electric Company and Ken-Rad Tube & Lamp Corporation, dated July 1, 1933 (referred to in Exhibit 27–G) and any and all amendments thereto.

(30) Agreement between General Electric Company and Tung-Sol Lamp Works, Inc., dated October 1, 1933 (referred to in Exhibit 27–G) and any and all amendments thereto.

(31) Agreement between General Electric Company and Chicago Miniature Lamp Works, dated January 1, 1934 (referred to in Exhibit 27–G) and any and all amendments thereto.

### EXHIBIT B
#### Foreign Contracts Referred to in Section IV–B.

(1) Contract between International General Electric Company and Osram G. m. b. H. Kammanditgesellschaft (Germany), dated July 1, 1929 and any and all amendments thereto (Exh. 39–G). Vested in Office of Alien Property Department of Justice, pursuant to Vesting Order 1243 executed April 20, 1943; 8 Fed.Reg. 8564.

(2) Contract between International General Electric Company and Vereinigte Gluehlampen & Electricitaets A. G. (U. I. L.) (Hungary), dated August 12, 1938 and any and all amendments thereto (Exh. 41–G). Vested in Office of Alien Property, Department of Justice,

pursuant to Vesting Order 1243 executed April 20, 1943; 8 Fed.Reg. 8564.

(3) Contract between International General Electric Company and Tokyo Shibaura Electric Co., Ltd. (Japan), dated October 12, 1939, and any and all amendments thereto, (Exh. 47–G). Vested in Office of Alien Property, Department of Justice, pursuant to Vesting Order 1243 executed April 20, 1943; 8 Fed.Reg. 8564.

(4) Contract between International General Electric Company and N. V. Philips Gleeilampenfabrieken (Holland), dated March 14, 1931 and any and all amendments thereto (Exh. 40a–d–G; also Exh. P–5).

(5) Contract between International General Electric Company and Compagnie des Lampes (France), dated August 10, 1927 and any and all amendments thereto, (Exh. 42–G). Vested in Office of Alien Property, Department of Justice, pursuant to Vesting Order 1243 executed April 20, 1943; 8 Fed.Reg. 8564.

(6) Contract between International General Electric Company and Associated Electrical Industries, Limited, et al. (England), dated August 24, 1939 and any and all amendments thereto (Exh. 43–G).

(7) Contract between International General Electric Company and General Electric Limited (England), dated April 1, 1922 and any and all amendments thereto (Exh. 48–G).

(8) Agreements between General Electric Company and O. G. and R. Joseph Inwald, A. G., dated October —, 1937 (Exhs. 1139a–g and 1139b–g).

There is no difference in the listing of the contracts in Exhibits A and B in the proposals of the Government and General Electric except that General Electric has identified them by exhibit numbers and listed separately the foreign contracts. Inasmuch as General Electric's method conforms to the treatment of agreements in Section IV of the judgment, it has been accepted.

APPENDIX

TABLE 1—Relative industry position in the domestic incandescent lamp business [1]

[Sales in thousands of dollars, 1946–50]

| Company | 1946 | | 1947 | | 1948 | | 1949 | | 1950 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Sales | Percent of total | Sales | Percent of total | Sales | Percent of total | Sales | Percent of total | Sales | Percent of total |
| General Electric Co. | 62,791 | 58.8 | 80,627 | 58.6 | 89,357 | 58.8 | 83,981 | 57.1 | 95,046 | 54.1 |
| Westinghouse Electric Corp.[2] | 18,758 | 17.6 | 30,191 | 22.0 | 32,816 | 21.6 | 33,854 | 23.0 | 43,144 | 24.8 |
| Sylvania Electric Products, Inc. | 8,237 | 7.7 | 10,419 | 7.6 | 14,441 | 9.5 | 14,474 | 9.8 | 18,390 | 10.6 |
| Consolidated Electric Lamp Co. | 2,512 | 2.4 | 2,775 | 2.0 | 2,429 | 1.6 | 2,379 | 1.6 | 2,567 | 1.5 |
| Tung-Sol Lamp Works, Inc. | 3,448 | 3.2 | 4,670 | 3.4 | 4,533 | 3.0 | 5,004 | 3.4 | 6,445 | 3.7 |
| Chicago Miniature Lamp Works | 247 | .2 | 241 | .2 | 203 | .1 | 220 | .2 | 379 | .2 |
| Total | 95,993 | 89.9 | 128,923 | 93.8 | 143,779 | 94.6 | 139,912 | 95.1 | 165,971 | 95.6 |
| Remainder of industry | 10,778 | 10.1 | 8,556 | 6.2 | 8,229 | 5.4 | 7,177 | 4.9 | 7,687 | 4.4 |
| Total | 106,771 | 100.0 | 137,479 | 100.0 | 152,008 | 100.0 | 147,089 | 100.0 | 173,658 | 100.0 |

1. Excludes fluorescent, germicidal and electric discharge lamps.
2. Includes Ken-Rad Lamp Division.
Source: Exhibits G–1D, G–1D(a), G–3D, G–3D(a), G–19D, G–19D(a), G–30D, G–30D(a), G–30D(b), G–33D, G–33D(a), G–35D(b), G–70D, G–70D(a).

TABLE 2—Relative industry position in the domestic large incandescent lamp business [1]

[Sales in thousands of dollars, 1946–50]

| Company | 1946 | | 1947 | | 1948 | | 1949 | | 1950 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Sales | Percent of total | Sales | Percent of total | Sales | Percent of total | Sales | Percent of total | Sales | Percent of total |
| General Electric Co. | 45,819 | 58.3 | 52,170 | 56.8 | 57,022 | 58.0 | 53,949 | 57.1 | 62,528 | 56.1 |
| Westinghouse Electric Corp.[2] | 14,915 | 19.0 | 22,158 | 24.2 | 25,223 | 25.7 | 24,772 | 26.2 | 29,998 | 26.9 |
| Sylvania Electric Products, Inc. | 6,709 | 8.5 | 7,436 | 8.1 | 7,216 | 7.3 | 7,777 | 8.2 | 10,582 | 9.5 |
| Consolidated Electric Lamp Co. | 2,512 | 3.2 | 2,775 | 3.0 | 2,429 | 2.5 | 2,380 | 2.5 | 2,567 | 2.3 |
| Total | 69,955 | 89.0 | 84,539 | 92.1 | 91,890 | 93.5 | 88,878 | 94.0 | 105,675 | 94.8 |
| Remainder of industry | 8,570 | 11.0 | 7,259 | 7.9 | 6,416 | 6.5 | 5,586 | 6.0 | 5,820 | 5.2 |
| Total industry sales | 78,525 | 100.0 | 91,798 | 100.0 | 98,306 | 100.0 | 94,464 | 100.0 | 111,495 | 100.0 |

1. Excludes fluorescent, germicidal, electric discharge, and photoflash lamps.
2. Includes Ken-Rad Lamp Division.
Source: Exhibits G–1D, G–1D(a), G–3D, G–3D(a), G–19D, G–19D(a), G–30D, G–30D(b), G–33D, G–33D(a).

TABLE 3—Relative industry position in the domestic miniature incandescent lamp business

[Sales in thousands of dollars, 1946–50]

| Company | 1946 | | 1947 | | 1948 | | 1949 | | 1950 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Sales | Percent of total | Sales | Percent of total | Sales | Percent of total | Sales | Percent of total | Sales | Percent of total |
| General Electric Co. | 11,582 | 57.9 | 17,330 | 58.0 | 15,537 | 58.5 | 12,927 | 53.3 | 17,414 | 53.4 |
| Westinghouse Electric Corp. | 3,358 | 16.8 | 6,434 | 21.5 | 5,451 | 20.5 | 5,714 | 23.5 | 7,636 | 23.4 |
| Sylvania Electric Products, Inc. | 70 | .4 | 129 | .5 | 133 | .5 | 129 | .5 | 104 | .3 |
| Tung-Sol Lamp Works, Inc. | 3,448 | 17.2 | 4,670 | 15.6 | 4,533 | 17.1 | 5,004 | 20.6 | 6,445 | 19.8 |
| Chicago Miniature Lamp Works | 247 | 1.2 | 241 | .8 | 203 | .7 | 220 | .9 | 379 | 1.2 |
| Total | 18,705 | 93.5 | 28,824 | 96.4 | 25,857 | 97.3 | 23,994 | 98.8 | 31,978 | 98.1 |
| Remainder of industry | 1,296 | 6.5 | 1,079 | 3.6 | 711 | 2.7 | 302 | 1.2 | 616 | 1.9 |
| Total industry sales | 20,001 | 100.0 | 29,903 | 100.0 | 26,568 | 100.0 | 24,296 | 100.0 | 32,594 | 100.0 |

Source: Exhibits G–1D, G–1D(a), G–3D, G–3D(a), G–19D, G–19D(a), G–30D, G–30D(b), G–35D(a), G–35D(b), G–70D, G–70D(a).

TABLE 4—Relative industry position in the domestic Xmas tree incandescent lamp business

[Sales in thousands of dollars, 1946–50]

| Company | 1946 | | 1947 | | 1948 | | 1949 | | 1950 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Sales | Percent of total | Sales | Percent of total | Sales | Percent of total | Sales | Percent of total | Sales | Percent of total |
| General Electric Co.......... | 3,721 | 75.2 | 8,218 | 85.8 | 12,113 | 78.9 | 11,584 | 69.4 | 8,594 | 64.8 |
| Westinghouse Electric Corp. | 315 | 6.4 | 1,142 | 11.9 | 1,616 | 10.5 | 2,699 | 16.2 | 3,577 | 27.0 |
| Sylvania Electric Products, Inc. ............. | none | .... | none | .... | 522 | 3.4 | 1,050 | 6.3 | 502 | 3.8 |
| Total ............... | 4,036 | 81.6 | 9,360 | 97.7 | 14,251 | 92.8 | 15,333 | 91.9 | 12,673 | 95.5 |
| Remainder of industry....... | 911 | 18.4 | 224 | 2.3 | 1,102 | 7.2 | 1,350 | 8.1 | 597 | 4.5 |
| Total industry sales..... | 4,947 | 100.0 | 9,584 | 100.0 | 15,353 | 100.0 | 16,683 | 100.0 | 13,270 | 100.0 |

Source: Exhibits G–1D, G–1D(a), G–3D, G–3D(a), G–19D, G–19D(a), G–30D, G–30D(b).